NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 17, 2024

S23A1075.  REMLER v. THE STATE.

MCMILLIAN, Justice.

Justin Remler challenges his 2019 conviction for felony murder in connection with the death of Tristan Mitchell, who was two years and nine months old.[1]  Remler contends that the evidence was not legally sufficient to support the jury's verdict, that a defense expert was wrongly prevented from testifying that a preexisting heart

---

[1] Tristan died on September 12, 2016.  On May 10, 2017, Remler was indicted by a Chatham County grand jury for malice murder, felony murder, and aggravated assault.  After a trial held from December 16 to 20, 2019, the jury acquitted Remler of malice murder, but it found him guilty of felony murder and aggravated assault.  Following a sentencing hearing held on January 17, 2020, the trial court imposed a sentence of life in prison with the possibility of parole for the felony murder and merged the aggravated assault into the felony murder.  On January 21, 2020, Remler filed a motion for a new trial, which he amended on February 16, 2022.  After conducting a hearing on May 17, 2022, the trial court denied the amended motion on May 1, 2023. Remler filed a timely notice of appeal on May 3, 2023, and this appeal was docketed to the August 2023 term of this Court and was submitted for a decision on the briefs.

condition was the likely cause of Tristan's death, that the trial court's instruction to the jury on proximate cause was erroneous, that the trial court's instruction regarding the relationship between the counts of aggravated assault and felony murder was erroneous, that trial counsel rendered ineffective assistance, and that the cumulative effect of the trial court's errors and trial counsel's deficiencies require a new trial. For the reasons set forth below, we affirm.

The evidence presented at Remler's trial showed the following. In August 2016, Remler was dating Courtney Metts, and the pair frequently exchanged text messages, including about the behavior of Metts's son, Tristan, who was two years and nine months old. On August 2, 2016, Remler texted, "[Y]ou need to just let me keep him for a few days." He then suggested, "[S]lap the s**t out of him." When Metts texted to complain about Tristan again just over an hour later, Remler texted: "[G]rr, go in there, grab him, and look him in the eye. Shake him around, make sure he knows you mean f***ing business."

2

On August 11, 2016, Metts sent Remler a video recording from earlier that evening of Tristan sitting on the floor intermittently making wailing sounds, and she commented that Tristan was then in his bed crying. Remler suggested in reply: "Go in there and storm up to him and grab him hard. Shake him and slap him and tell him no crying. You have to use force, like more than you think. It's not going to hurt him. He's super tough." He added, "You don't actually have to hurt him. They get the message as long as you use force and make eye contact and [a] loud voice." Then just over an hour later, Remler offered: "I can try to help discipline him. But it will take time and multiple days with me." He added: "And I'll discipline him so good that by the time he's done, he'll want to come home to you so bad." Metts responded, "Y'all have to have fun, too though. He's only [nearly] three. If it's all punishment and no fun he won't understand." Remler replied, "I'm not just going to beat him the whole time."

On August 13, 2016, Metts texted Remler: "Don't spank Tristan's a** today. He has bruises on his a** for some reason."

3

Remler replied: "I didn't even spank his butt that hard either for real. Maybe his butt is more sensitive than anything else. Ha." Several hours later, Remler texted: "He's still got those bruises on his back from the washing machine, I think." He added, "But I really didn't spank his butt that much."

On August 15, 2016, Tristan showed one of the teachers at his daycare center a large, protruding bruise on his forehead. The teacher also discovered bruises on his ear and in his ear that she thought "looked really bad" and a bruise on his leg or thigh area. She and the school director then lifted his shirt and saw more bruises on his back. The director took photographs and reported the matter to the Division of Family and Children Services ("DFCS"). That same day, a DFCS worker contacted Metts, who "stated that the child was on a washer or a dryer and fell off while her boyfriend [Remler] was watching the child that day." The DFCS worker instructed Metts to take Tristan to the emergency room for evaluation, but he took no further action on the case. Metts texted Remler about the bruises on Tristan, and Remler replied, "I don't

4

touch his ears. I knew about the forehead, and the washer kind of scraped up his back."

On August 19, 2016, Metts texted Remler about how Tristan had been asking about him, and Remler replied, "I'm surprised he likes me so much even though I spank and smack him."

Metts and Remler then apparently took a break in their relationship, but their relationship had resumed by September 12, 2016, when Remler took Tristan to the house he lived in with his parents to babysit him while Metts worked. Remler's mother, who was suffering from a medical condition and was essentially confined to her bedroom, later reported that during that day she heard banging coming from Remler's bedroom above her own, which she assumed was Tristan "jumping" or Remler and Tristan "roughhousing." At 5:01 p.m., Remler texted Metts, saying: "IDK [I don't know] if you felt it or not but there's a little bump on his head. IDK if he got it from staying with Brandon [his father] or what. I just felt it. It's nothing big but still a bump." However, at about this same time, according to his audio-recorded statement to an

5

investigator, Remler was just discovering that Tristan was unresponsive following a nap. Remler took Tristan from his own room to his mother's room downstairs. His mother, a former nurse, noted that Tristan's heart was beating rapidly but that he was not breathing. She performed artificial respiration as she spoke with a 911 operator. A paramedic, who responded to the 911 call, examined Tristan and noted, "[H]is eyes were fixed and dilated which means there's been obviously no oxygen to his brain for some time." He also noted "bruising around the eyes" that is indicative of someone not breathing, and one eye being "bigger than the other, like indicative of head injury." He also testified about Remler's communication with him at the scene: "he was changing his story as to what happened." Tristan was taken to the hospital where he was pronounced dead.

Dr. Natasha Grandhi, who performed Tristan's autopsy, was called to testify at trial by the State. In addition to numerous minor injuries, Dr. Grandhi noted a number of bruises and abrasions on Tristan's head. An internal examination of the head revealed

6

bleeding in the muscle tissue in the jaw, "fine pinpoint areas of bleeding that were scattered through the eyelids," "subgaleal scalp hemorrhages" in multiple places, "bleeding on the surface of the brain, a "slightly enlarged" brain indicative of the brain's self-healing reaction to an injury, and "a bruise on one of the portions on the base of the brain." She explained that the brain injuries could have been caused by "[b]lunt trauma which can be from a variety of mechanisms" but not typically from simple trips and falls in children. She opined that Tristan's brain injuries could have been caused at different times but that they were all sustained within "one or two days" of his death and that the death was caused by "blunt force head trauma." She also noted an "enlargement of the heart" and "rounded appearance" to the heart; however, microscopic examination failed to reveal "pathology or disease" in the heart.

Dr. Donna Evans, a physician board-certified in evaluating children who are suspected victims of abuse, was also called to testify by the State. She noted various aspects of Tristan's condition at the scene, in the emergency room, and in his autopsy that were

7

indicative of "inflicted head trauma." Her opinion was that "this was an inertial event with an impact, given that there are signs of impact in the skull and on the skull, in the brain, and in the scalp that ultimately led to [Tristan's] death" by causing "a lack of oxygen to the brain" through impaired breathing. She dismissed any suggestion of some other cause of death such as a heart condition.

Dr. Byron Mainor, who had treated Tristan on the day of his death, was called by the defense to testify as an expert in pediatrics and emergency pediatric medicine. His testimony essentially excluded trauma as a cause for many of Tristan's minor injuries; however, he testified that Tristan had bilateral retinal hemorrhaging and that such a finding "should raise clinical suspicions for an injury to the head."

Dr. Ian Hood also was called by the defense, as an expert in clinical and forensic pathology. He explained that Tristan's bruises were "all pretty trivial" and that persons who suffer sudden death from blunt force trauma have severe injuries such as "multiple skull fractures" and will present as "massively bruised." However, he

8

explained that "the exception" would be where the victim suffered "shaking" or "perhaps the child is flung violently into a soft forgiving surface so that the head shakes." While he acknowledged that Tristan had some injuries consistent with such an action, he dismissed the subdural hemorrhaging as being "pretty minimal," the brain swelling as only being secondary to lengthy resuscitation efforts, the bruise to the brain as being "really trivial," and the retinal hemorrhages as having not been properly examined to determine their severity and potentially having been caused by resuscitation efforts. He opined that a "far more competent cause of sudden loss of circulation in this child" was the fact that he had "a grossly abnormal enlarged heart" that was "abnormally formed" and "globular in shape."

Dr. Victor Rosenfeld was then called by the defense as an expert in neurology. He opined that the medical examiner's conclusion that "blunt force trauma" was the cause of death "was not supported by any of the evidence stated in that autopsy report." Specifically regarding the subdural hemorrhaging and the temporal

9

lobe brain contusion, he stated: "Neither of those injuries would be responsible for death. Neither of those injuries would even be responsible for any neurological injury in a live patient." He attempted to describe an alternative "finding that was most concerning to [him]," but the trial court sustained an objection by the State that any testimony from him regarding an alleged heart deformity was beyond the scope of his expertise in neurology.

As a rebuttal witness, Dr. James Downs was called by the State as an expert in clinical and forensic pathology and abusive head trauma. He rejected the suggestion that any of Tristan's injuries were from resuscitation efforts. He noted that Tristan had signs of nine separate impacts to the head, with some on each side and with the largest two creating injuries greater than one inch in length. He stated that the nine impacts could have been from either something striking Tristan's head or Tristan's head striking something, and he found the latter to be more likely. He also stated that the absence of additional external injuries could be explained by Tristan's having impacted "a broad flat soft surface like a couch." He testified that

10

"[w]hat damages people with this type of injury is damage to the nerve fibers of the brain." He ruled out the possibility that Tristan's fatal injuries had occurred a day or two before his death. Finally, he rejected Dr. Hood's theory regarding an allegedly enlarged and abnormally shaped heart, explaining that the angle of the autopsy photographs of the heart created a distorted impression and that the weight of the heart was in the middle of the normal range for a child of Tristan's age.

Finally, Dr. Hood was called as a witness again by the defense. He reasserted his opinion that resuscitation efforts had caused many of Tristan's injuries, and he maintained that it is "very unusual" for a brain trauma to cause a sudden stoppage of the heart and that such cases usually involve "massive very obvious trauma to the brain." He also asserted that the absence of small hemorrhages in the "white matter of the brain" was inconsistent with Dr. Downs's theory of the case.

1. Remler argues that the evidence presented at trial was insufficient to support his conviction as a matter of constitutional

11

due process.  In considering such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (emphasis in original).  It is undisputed that Remler was alone with Tristan in the hours before he died and that Remler had admitted in text messages that he previously hit Tristan on several occasions in an attempt to discipline him.  The State's expert witnesses also opined that Tristan died from blunt force trauma, and Dr. Downs ruled out that Tristan's fatal injuries could have occurred a day or two before his death.  Although the expert evidence was conflicting, we conclude, construing all of the evidence in the light most favorable to the verdict, that the evidence was sufficient to authorize a rational trier of fact to conclude beyond a reasonable doubt that Remler was guilty of felony murder predicated on aggravated assault.  See *Foster v. State*, 306 Ga. 587, 590 (1) (832

12

SE2d 346) (2019) (concluding that the evidence was sufficient despite the presence of "competing expert testimony").

Remler also contends that the evidence was insufficient as a matter of Georgia statutory law because circumstantial evidence of guilt must "'exclude every other reasonable hypothesis save that of the guilt of the accused.'" *Sullivan v. State*, 308 Ga. 772, 777 (1) (a) (843 SE2d 411) (2020) (quoting OCGA § 24-14-6). Specifically, Remler argues that the evidence supported that Tristan died due to an enlarged heart or that Tristan's father had watched Tristan the weekend before Tristan's death and could have inflicted the injuries. But "[w]hether alternative hypotheses are reasonable, however, is usually a question for the jury, and this Court will not disturb the jury's finding unless it is insufficient as a matter of law." Id. It was within the jury's purview to reject the alternative hypotheses that someone else inflicted the trauma on Tristan before the day of his death or that Tristan's death was caused by an enlarged heart as unreasonable given the evidence presented. Thus, we conclude that

the evidence was also sufficient as a matter of Georgia statutory law. See OCGA § 24-14-6.

2. Remler also argues that the trial court improperly refused to allow one of his expert witnesses, Dr. Rosenfeld, to testify that Tristan's death was caused by an enlarged heart. Dr. Hood, whom the trial court qualified as an expert in clinical and forensic pathology, was permitted to testify under questioning by the defense that Tristan's death was likely caused by a previously undiagnosed heart deformity. However, the trial court sustained an objection by the State when Dr. Rosenfeld, who had been qualified as an expert in neurology, stated that he was prepared to testify under questioning by the defense regarding a cause of death other than blunt force trauma to the head, referring implicitly to the victim's alleged heart deformity. The trial court stated: "You know, given the specialty that he's tendered under, which does not include forensic pathology which is what we're talking about here, I'm going to have to sustain the objection." Remler argues that the trial court abused its discretion by excluding Dr. Rosenfeld's testimony. See

14

OCGA § 24-7-707 (effective prior to July 1, 2022); *Corbett v. State*, 266 Ga. 561, 563 (2) (468 SE2d 757) (1996) ("In Georgia, a medical expert is an individual possessing technical and peculiar knowledge, and any person learned in medical or physiological matters is qualified to testify as an expert thereon, even though he is not a medical practitioner.") (citation and punctuation omitted).

Pretermitting whether the trial court abused its discretion in restricting Dr. Rosenfeld's testimony, any such error is harmless if it is highly probable that the error did not contribute to the verdict. See *Jackson v. State*, 306 Ga. 69, 80 (2) (c) (829 SE2d 142) (2019) ("[T]he test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (citation and punctuation omitted)). As the trial court noted in deciding Remler's motion for a new trial, Dr. Rosenfeld testified freely about his opinion as an expert in neurology that the victim had not died from his brain injuries, and Dr. Rosenfeld's potential testimony regarding the possibility that the victim died as the result of an enlarged heart was cumulative of the testimony of

15

Dr. Hood in his role as an expert in pathology. See *Neuman v. State*, 311 Ga. 83, 94 (4) (b) (ii) (856 SE2d 289) (2021) ("Even if we assume that the trial court abused its discretion by limiting Dr. Flores's testimony about these subjects, such error was harmless because the excluded testimony was cumulative of other admitted evidence."). Also, Dr. Rosenfeld's credibility was undermined because it came out in testimony that Remler's father, who was also a physician, practiced with Dr. Rosenfeld and had asked Dr. Rosenfeld to testify on Remler's behalf, a fact that could lead reasonable jurors to doubt his testimony. Thus, even if the trial court abused its discretion in not allowing Dr. Rosenfeld to testify that Tristan's death was caused by an enlarged heart, it was highly probable that the error did not contribute to the verdict.

3. Remler also contends that the trial court erred in responding to a question the jury asked about the causal relationship between the felony of aggravated assault and the subsequent death. During its deliberations, the jury sent a note to the trial court asking: "Question on felony murder – 'It is not enough that the homicide

occurred soon or presently after the felony was attempted or committed.' Does this mean it has to be sudden death? Or can it be the felony can be the start of a continuous process to death or the precipitating event to death?" After conferring with counsel, the trial court announced that it would repeat its charge on felony murder, instruct the jury that "cause" meant "proximate cause," and then define "proximate cause." The trial court indicated that it would use the definition of "proximate cause" in *Anthony v. State*, 303 Ga. 399, 413 (13) n.19 (811 SE2d 399) (2018), as requested by the State, rather than the one in *State v. Jackson*, 287 Ga. 646, 652 (2) (697 SE2d 757) (2010), as requested by the defense. The trial court proposed revising the definition in *Anthony*, and it ultimately charged as follows:

> Proximate cause exists when the alleged act played a substantial part in the bringing about of the decedent's death, and the death was either a direct result or reasonable probable consequence of the act. Where one inflicts an unlawful injury upon the person of another, such injury may be found to be the cause of death of the person injured whenever it shall be made to appear that the injury itself constituted the cause of death or directly

17

and materially *contributed to the happening of a consequential death.*

(emphasis supplied).

As an initial matter, the State argues that Remler failed to preserve this error for ordinary appellate review and that plain error review applies because although Remler objected to the trial court's ruling that it would give an instruction based on *Anthony*, rather than *Jackson*, Remler did not object again after the trial court had actually given that instruction based on *Anthony*. Pretermitting whether Remler was required to object a second time in order to preserve this error for ordinary appellate review, we conclude that Remler has not shown that the trial court committed any error.

Remler argues that the trial court erred in not instructing that proximate cause exists where a felony "directly and materially contributed to the *happening of a subsequent accruing immediate cause of the death.*" *Jackson*, 287 Ga. at 652 (2) (emphasis supplied) (citation and punctuation omitted). Because the trial court did not use this language and instead charged that the injury must have

"directly and materially contributed to the *happening of a consequential death,*" Remler contends that the charge as given in his case only required that the victim was injured and eventually died, even if there was some intervening cause of death.

First, we think that Remler misunderstands the holding of *Jackson,* because *Jackson* addresses the situation where an act causes some *other* thing to happen that is the "immediate" cause of the victim's death.  See *Eubanks v. State*, 317 Ga. 563, 570 (2) (a) (ii) (894 SE2d 27) (2023) (citing *Jackson* and addressing the foreseeability of intervening acts that may have ensued naturally from a criminal act or may have been set in motion by that act). Furthermore, although we can see why Remler preferred the inclusion of the word "immediate" given that there was a time delay between Tristan's injuries and his subsequent death at the hospital, Remler was not entitled to a charge "in the precise language requested," even if his interpretation of these cases were correct. *Thomas v. State*, 297 Ga. 750, 754-55 (4) (778 SE2d 168) (2015). After  reviewing the charge as a whole, we conclude that the charge

19

was "an accurate statement of the law and was sufficient to instruct the jury on the principles of proximate causation relevant to this case." *Treadaway v. State*, 308 Ga. 882, 890 (843 SE2d 784) (2020) (approving proximate cause charge that, like the charge here, did not explicitly require "immediate" causation). See also *Anthony*, 303 Ga. at 413 (13). Accordingly, we see no error in the charge given by the trial court.

4. Remler also argues that the trial court erred in answering the jury's questions about the relationship between the counts for aggravated assault and felony murder. During its deliberations, the jury asked the following two-part question: "Could the defendant be found guilty for aggravated assault but not felony murder. Or if found guilty of aggravated assault, and victim dies, is defendant automatically guilty of felony murder?" When the trial court proposed telling the jury that they were authorized to convict or acquit on each charge independently, defense counsel objected and argued that the court should simply answer "no" to the second part of the two-part question. Indicating that it did not want to be

20

"suggestive" in its response, the trial court instructed the jury: "The defendant is charged with three counts in the indictment. And the jury is authorized to find the defendant not guilty or guilty on any or all of them independently." Remler argues now that, by not providing simple "yes" and "no" answers to each of the jury's questions, the trial court's response was confusing and misleading.

Pretermitting the State's argument that this issue has not been preserved for ordinary appellate review and that, instead, plain error review applies, we conclude that the trial court's charge responded to the jury's questions, accurately told the jury to consider each count of the indictment independently, and was not misleading. See *Blake v. State*, 292 Ga. 516, 517-18 (2) (739 SE2d 319) (2013) (no error where a response to a jury question indicated the jury should "'consider each count separately'"). Furthermore, we note that Remler was not entitled to a charge "in the precise language requested." *Thomas*, 297 Ga. at 754-55 (4). Accordingly, we conclude that the trial court did not err in responding to the jury's questions, regardless of the form of review that applies.

21

5. Remler argues that his trial counsel rendered ineffective assistance (a) by failing to elicit evidence that Tristan's father, who was housing Tristan on the weekend before his death, could have caused Tristan's injuries and (b) by failing to request a charge on accident. An ineffective assistance of counsel claim requires a showing of both deficient performance by counsel and resulting prejudice. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To show deficient performance, a defendant must show that his or her counsel took an approach that was "objectively unreasonable." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013) (citing *Strickland*, 466 U. S. at 687-88 (III) (A)). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U. S. 86, 104 (IV) (104 SCt 770, 178 LE2d 624) (2011) (quoting *Strickland*, 466 U. S. at 689 (III) (A)). If counsel's performance was deficient, relief is warranted only if "there is a reasonable probability that, but for counsel's

22

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U. S. at 694 (III) (B). This Court may decide an ineffective assistance claim based solely on a lack of deficient performance or based solely on an absence of prejudice. See *Caldwell. v. Edenfield*, 316 Ga. 751, 753 (II) (890 SE2d 238) (2023) (citing *Strickland*, 466 U. S. at 697 (IV)).

(a) Remler first argues that his trial counsel rendered ineffective assistance by failing to present evidence suggesting that Tristan's father was responsible for Tristan's death. In support of this theory, Remler argues that the father was housing Tristan during the weekend before Tristan's death and that, as shown by court records, the father had a prior history of domestic violence directed toward Tristan's mother, a history that lead counsel acknowledged in his motion for new trial testimony did not include evidence of any violence toward Tristan. However, even if such evidence of violence against Tristan's mother had been admissible, it would have been inconsistent with Remler's main defense, which was focused on evidence that Tristan died from an enlarged heart

23

rather than abuse from *anyone,* and "the strategy of not presenting logically conflicting alternative defense theories was objectively reasonable professional conduct." *Williams v. State*, 316 Ga. 304, 320 (5) (d) (888 SE2d 60) (2023). Thus, Remler's ineffective assistance of counsel claim on this ground fails.

(b) Remler next argues that his trial counsel rendered ineffective assistance by failing to request a jury charge on accident, which we note was a theory that counsel did not discuss in his closing argument at trial.[2] The only evidence even arguably supporting an accident in this case was the statement from Remler's mother that she heard Remler and Tristan "jumping around, playing" or Remler and Tristan "roughhousing." However, in light of the weakness of the evidence suggesting an accidental death and the strength of the evidence showing Remler's role in Tristan's death, we conclude that Remler has failed to show deficient performance regarding a possible charge on accident, especially

---

[2] However, we acknowledge lead counsel's testimony that his failure to request a charge on accident was "an oversight."

24

given the fact that counsel's core strategy, as underscored by counsel's closing argument, was to show that, while the victim had numerous bruises and had brain injuries, the cause of his death was sudden cardiac arrest resulting from a congenital heart deformity. See *Williams*, 316 Ga. at 320 (5) (d) (holding that it can be "objectively reasonable professional conduct" to focus on one defense theory). Remler's claim for ineffective assistance of counsel on this ground also fails.

6. Remler correctly notes that this Court will "consider collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel," and he argues that such cumulative prejudice requires relief in his case. *State v. Lane*, 308 Ga. 10, 17 (1) (838 SE2d 808) (2020). As set forth above, we assume trial court error regarding the limitation of the testimony of a defense expert; however, we identify no other trial court errors that might affect our cumulative prejudice analysis. As to the alleged ineffective assistance of trial counsel, above we have identified no deficient performance on the part of trial counsel;

25

therefore, there is nothing from that claim to be considered for the purpose of cumulative prejudice. Accordingly, we conclude that Remler's claim here must fail.

*Judgment affirmed. All the Justices concur.*