NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 04, 2025

S24A1121.  CLEMENTS v. THE STATE.

COLVIN, Justice.

Appellant James Damon Clements appeals his conviction for felony murder related to the beating death of Shannon Goetz and his sentence for the aggravated assault of Gregg Olson.[1] On appeal,

---

[1] The crimes occurred on December 22, 2017. On August 12, 2019, a Cherokee County grand jury returned a six-count indictment, charging Appellant with malice murder (Count 1), felony murder (Count 2), which was predicated on a charge of aggravated battery, family violence of Goetz (Count 3), aggravated assault of John Crawford (Count 4), aggravated assault of Olson (Count 5), and battery of Olson (Count 6). Following a jury trial from February 7 to 10, 2022, the jury returned a verdict finding Appellant not guilty of malice murder (Count 1) but guilty on all remaining counts except for Count 4, where the jury found Appellant guilty of the lesser-included charge of simple assault.

On March 1, 2022, the trial court sentenced Appellant to life in prison for felony murder (Count 2). The court also sentenced Appellant to 12 months in prison for the simple assault of John Crawford (Count 4), 25 years to serve for the aggravated assault of Olson (Count 5), and 12 months to serve for the battery of Olson (Count 6), with each sentence to run concurrently with Appellant's life sentence for felony murder (Count 2). Lastly, the Court merged Appellant's conviction for aggravated battery, family violence of Goetz (Count 3) into his conviction for felony murder (Count 2).

Appellant filed a timely motion for new trial on March 7, 2022, which he

Appellant argues that the evidence presented at trial was insufficient to sustain his conviction under OCGA § 24-14-6 because the State failed to exclude the reasonable hypothesis that Goetz's death was caused by her voluntary methamphetamine use rather than her injuries. Appellant further argues that his initial sentence of 25 years in prison for his aggravated assault of Olson exceeded the statutory maximum of 20 years set forth in OCGA § 16-5-21 (b). Appellant acknowledges that the trial court subsequently reduced his sentence to 20 years but argues that it failed to take certain additional steps necessary to ensure that his sentence is enforced as modified. For the reasons explained below, Appellant's arguments fail. We accordingly affirm Appellant's conviction for felony murder and his 20-year sentence for aggravated assault.

    1. (a) The evidence at trial showed the following.[2] Goetz,

---

amended through new counsel on January 11, 2023. Following a hearing on March 9, 2023, the trial court issued an order on Appellant's amended motion on March 30, 2023, in which it modified Appellant's sentence for Count 5 by reducing it from a term of 25 years in prison to a term of 20 years. The trial court denied Appellant's motion in all other respects.

    [2] Appellant appeals only his conviction for felony murder of Goetz, and

Appellant, and several others lived together in a single-family home owned by Olson. Olson testified that "everybody" in the household used drugs and that he had smoked methamphetamine with Goetz. Allyson Dietrich, who lived in the house at the time of Goetz's death, testified that Goetz invited Dietrich to smoke with her and told Dietrich that she smoked methamphetamine "twice a day."

According to Olson, Appellant started a romantic relationship with Goetz after he moved in. Though Appellant initially slept in a bedroom on the first floor, he later moved into Goetz's bedroom in the basement. According to Olson, Goetz told him a day or two before her death that she and Appellant "were fighting a lot," and that Appellant had hit her. Olson noted that Goetz had a split lip and "looked like she had been hit in the mouth." Olson later confronted Appellant about his violence towards Goetz, and, according to Olson, "we both agreed that he had to go."

Text messages from Goetz's phone to Appellant's phone

---

he does so only by arguing that the evidence was insufficient as a matter of statutory law. We therefore do not address the facts related to Appellant's convictions for his crimes against Crawford and Olson.

3

corroborated Olson's testimony. These messages contain express references to Appellant striking Goetz on multiple occasions in the days and weeks prior to her death and suggest that Appellant had accused Goetz of infidelity. Further messages and testimony revealed that Goetz was planning to leave Appellant around the time she was killed.

Events came to a head on December 22, 2017. At 6:57 p.m. that evening, Appellant called 911 because Goetz was not breathing. Appellant identified himself on the call as Olson, before handing the phone to Dietrich and fleeing the scene. When first responders arrived, they found Goetz deceased in the basement, lying face-up and covered only by a bra. Appellant was gone.

Dietrich, who was present for at least part of the 911 call, testified that Goetz's "whole body was black and blue[,] and she was about twice the size that she normally was." Though first responders arrived shortly after the call was made, they did not attempt any life-saving measures. A crime scene technician who observed Goetz's body testified that she had been dead for at least two hours.

4

Appellant was arrested two days later. At the time of his arrest, Appellant was wearing a sweatshirt and sweatpants that were later determined to have Goetz's blood on them.

(b) Three experts testified at trial regarding the cause and manner of Goetz's death: Dr. Stacey Desamours and Dr. James Upshaw Downs testified for the State, and Dr. Brian Frist testified for the defense. Their testimony was as follows.

*(i) Dr. Desamours's Testimony*

Dr. Desamours performed Goetz's autopsy as an associate medical examiner for the GBI. Dr. Desamours's report, which she read from at trial, noted that Goetz had more than 35 separate injuries in total. The injuries to Goetz's body included abrasions or contusions on both of her arms, her legs, her left buttock, her right shoulder, her right hand and her torso. Goetz also had "significant" injuries to her head and face, including contusions on her lips, cheek, and ear, as well as two separate subscapular hemorrhages on either side of her head. According to Dr. Desamours, Goetz's injuries appeared to have been "inflicted" rather than accidental, and Goetz

5

appeared to have been "beaten."

Despite the extent of these injuries, however, Dr. Desamours opined that they were not what caused Goetz's death. Instead, Dr. Desamours explained that Goetz had two subdural brain bleeds on the right side of her head: one which was one- to two-weeks-old at the time of Goetz's death and a separate recent bleed that was sometimes described at trial as a "re-bleed." Dr. Desamours determined that Goetz's cause of death was the more recent subdural bleed.

Notwithstanding Dr. Desamours's determination of the cause of death, she reported the manner of death as "undetermined." Dr. Desamours explained that Goetz had methamphetamine in her blood at the time of death and that Dr. Desamours could not determine whether Goetz's fatal brain bleed was the result of her inflicted injuries or was instead the result of her drug use. Dr. Desamours explained her decision at length:

> So, we know that the cause of death in this case is a subdural hematoma, but what were the circumstances? Well, we know that Ms. Goetz has blunt force injuries,

inflicted blunt force injuries. And if that were her only injuries . . . then . . . that would support the manner of death as homicide.

However, she also has methamphetamine intoxication and methamphetamine has been shown to cause a spontaneous subdural hematoma. And in this case it's actually even more complicated by the fact that Ms. Goetz had evidence of a prior subdural hematoma or a subdural hemorrhage, and that area was beginning to heal just in the . . . earliest stages of healing like one to [two] weeks old. And the body's healing process is to create a sort of a new brain out of that old blood. And with that new brain you have collagen . . . fibers, early scar tissues and very tiny immature capillaries, very small weak blood vessels. And those blood vessels . . . are very easily ruptured.

Methamphetamine is known to increase the blood pressure, increase the heart rate, and increase the risk of those small blood vessels potentially bleeding causing a subdural hematoma. If that had been her only injury onboard, the methamphetamine intoxication, that would support a manner of death as accident since it's a methamphetamine intoxication. So, since I had these two competing circumstances of death the most reasonable thing to do is to call the manner of death undetermined.

On redirect examination, Dr. Desamours clarified that Goetz's two subdural hematomas occurred in the "same area" of her brain, that it was possible that both bleeds were caused by Goetz being struck on the head at different times, and that it was further possible that

7

Goetz died from the cumulative effects of such blunt force trauma.

*(ii) Dr. Downs's Testimony*

The State also presented the testimony of Dr. Downs, who was formerly the director and chief medical examiner for the State of Alabama before working for the GBI in Savannah as its senior coastal regional medical examiner for more than a decade. Dr. Downs testified that he reviewed Dr. Desamours's report together with other materials from the case file. Based on his review, Dr. Downs opined that Goetz's manner of death was homicide.

Dr. Downs testified that Goetz had .73 milligrams of methamphetamine per liter of blood in her system and that the lethal range is from .09 milligrams to 64 milligrams. Dr. Downs explained that while Goetz's levels were within the lethal range, the lethal range of a drug is the concentration at which 50 percent of people die and 50 percent of people survive. "So," he explained, "you have to interpret that value in the context not only of the number but also the patient and what their experience is with that particular drug." And, in his view, a proper evaluation of Goetz's

8

methamphetamine levels would incorporate the fact that she was a chronic user of methamphetamine. Dr. Downs noted that Goetz's methamphetamine levels were at the lower end of the lethal concentration spectrum and that the high end "is a hundred times higher" than the concentration found in Goetz's blood. Dr. Downs further explained that methamphetamine is stored in a person's tissues, and, after death, it can be released from those tissues back into the bloodstream, causing post-mortem measurements of the amount of methamphetamine in a person's blood to be "artificially elevated."

Dr. Downs testified that a subdural hemorrhage caused by methamphetamine alone was "pretty rare" and "the frequency of that is so low that it's really outside the bell curve[.]" He estimated that the chance of such an event was "three to five percent," which he described as "not a reasonable consideration."

Like Dr. Desamours, Dr. Downs explained that Goetz had two different subdural brain bleeds one that occurred one- to two-weeks before her death, and a second, fatal bleed "around the time she

9

died." Dr. Downs also noted the extent and timing of Goetz's injuries, which included a recent injury to her right posterior scalp above the area of the fatal bleed. Taking all of these factors into consideration, Dr. Downs opined that Goetz's second bleed was *not* the "spontaneous[ ]" result of her methamphetamine use and that this fatal bleed "didn't happen from the methamphetamine." The manner of death, in his view, was "homicide."

### (iii) Dr. Frist's testimony

Dr. Frist testified for the defense. In his opinion, Dr. Desamours was correct to leave the manner of death undetermined. Dr. Frist agreed with the State's experts that Goetz had both a prior and a recent brain bleed, and that the recent bleed, which he described as a re-bleed of the prior subdural bleed, was the cause of her death. But Dr. Frist further stated that there were two possible causes of Goetz's fatal bleed — drugs and a "blow to the head" — and that "[no]body could make that distinction[.]"

2. Appellant argues that the evidence was insufficient as a matter of Georgia statutory law to support his conviction for felony

10

murder because it was wholly circumstantial and because the State failed to exclude the reasonable hypothesis that Goetz died from her voluntary use of methamphetamine. Even assuming the evidence presented was entirely circumstantial, as Appellant claims, his argument fails, as explained below.

"When a conviction is based [solely] on circumstantial evidence, the State must present sufficient evidence to 'exclude every other reasonable hypothesis save that of the guilt of the accused.'" *Hooks v. State*, 318 Ga. 850, 853 (2) (b) (901 SE2d 166) (2024) (quoting OCGA § 24-14-6)). We have explained, however, that "[n]ot every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable." *Hounkpatin v. State*, 313 Ga. 789, 792 (1) (873 SE2d 201) (2022). Whether an alternative hypothesis is reasonable and whether it has been excluded by the evidence are questions for the jury. See *Weston v. State*, 320 Ga. 472, 474 (1) (910 SE2d 155) (2024). And "we will not disturb the jury's findings on those questions unless they are insupportable as a matter of law."

11

Id.

Appellant contends that there were two reasonable theories consistent with Goetz's death being accidental, rather than homicide: (1) Goetz's fatal second bleed was the "spontaneous" result of her drug use, and (2) Goetz's fatal second bleed was a re-bleed of her prior hemorrhage caused by her drug use. Appellant claims that Dr. Downs failed to address — and therefore failed to exclude — the second possibility. As such, Appellant claims, the State failed to exclude every reasonable alternative to Appellant's guilt, and the evidence supporting his conviction was insufficient under OCGA § 24-14-6.

Appellant's argument fails, however, because Dr. Downs concluded that the second, fatal bleed "didn't happen from the methamphetamine." His conclusion is equally contrary to the two alternative theories raised by Appellant, including the theory he claims Dr. Downs failed to address. Because Dr. Downs addressed both theories, what remained was a dispute between experts that the jury decided in the State's favor, and we will not disturb the

jury's findings on this issue unless they are unsupportable as a matter of law. See *Remler v. State*, 318 Ga. 61, 65-66 (1) (897 SE2d 376) (2024) (holding that the jury was authorized to reject as unreasonable theories offered by a defense expert and to instead credit the theory of the State's expert that the child-victim died of injuries inflicted during the time it was in the defendant's sole care).

Appellant further argues, however, that the jury's findings in this matter were unsupportable as a matter of law. Specifically, Appellant argues that Dr. Downs merely concluded it was *unlikely* that Goetz's death was caused by methamphetamine, rather than ruling it out entirely. And because, in Appellant's view, the evidence presented by the State showed at best that it was unlikely that Goetz's death was caused by methamphetamine, there was insufficient evidence to support Appellant's conviction for felony murder.

But a close reading of the record shows that Dr. Downs was unequivocal in his opinion that Goetz's death was a homicide. Although Dr. Downs did testify that the odds of a spontaneous

13

hematoma were three to five percent, he testified conclusively that he did not "believe that [the] subdural was spontaneously traumatic" and that the fatal bleed "didn't happen from the methamphetamine." In other words, he opined that Goetz's death was not among the three to five percent of cases involving spontaneous subdural brain bleeds.

Dr. Downs, Dr. Desamours, and Dr. Frist all agreed that Goetz's death could have been caused by blunt-force injuries. But while Dr. Desamours and Dr. Frist testified that they could not determine whether Goetz's death was caused by those injuries or her drug use, Dr. Downs testified that such a determination could be made and that Goetz's death was not solely caused by methamphetamine. The jury was therefore authorized to credit Dr. Down's testimony over that of Dr. Desamours and Dr. Frist, and to exclude as unreasonable the hypothesis that Goetz died solely from her use of methamphetamine. See *Remler*, 318 Ga. at 65-66 (1) (holding that the evidence was sufficient to support the appellant's conviction under OCGA § 24-14-6 notwithstanding conflicting

14

expert testimony); *Hounkpatin*, 313 Ga. at 793-794 (1) (deferring to the jury's resolution of conflicting expert testimony regarding whether the child-victim died as the result of an accident rather than inflicted injuries, and concluding that the evidence was sufficient to support the appellant's conviction under OCGA § 24-14-6); *Guzman-Perez v. State*, 310 Ga. 573, 576-577 (1) (853 SE2d 76) (2020) (holding that the jury was authorized to reject as unreasonable the hypothesis that the victim's fatal injuries were caused by an accidental fall down the stairs rather than by inflicted injuries, even though the State's expert could not determine the cause of death). Because the jury was authorized to exclude, and did exclude, each alternative hypothesis to Appellant's guilt, the State presented evidence sufficient under OCGA § 24-14-6 to support Appellant's conviction for felony murder.

3. Appellant also appeals his sentence for aggravated assault. As noted in footnote 1 above, the trial court initially sentenced Appellant to 25 years in prison for the aggravated assault of Olson (Count 5). In his amended motion for new trial, Appellant correctly

argued that his 25-year sentence exceeded the 20-year maximum prison term set forth in OCGA § 16-5-21 (b) and that it was therefore void. See OCGA § 16-5-21 (b) ("Except [under circumstances not applicable here] a person convicted of the offense of aggravated assault shall be punished by imprisonment for not less than one nor more than 20 years."). At the motion for new trial hearing, the State conceded this point and "consent[ed]" to a modification of Appellant's sentence. Following the hearing, the trial court issued a written order "modif[ying]" Appellant's sentence for aggravated assault from 25 years in prison to 20 years and stating that "both parties hav[e] acknowledged and agreed to the same."

Notwithstanding this modification, Appellant argues on appeal that the trial court "never filed an amended sentence and never vacated the existing sentence on Count 5," and therefore that Appellant's sentence remains void. But Appellant cites no authority for the proposition that the trial court's modification order was insufficient to amend his sentence and that an additional order vacating his prior sentence was required. Because the trial court

16

amended Appellant's sentence for aggravated assault to 20 years, and Appellant's sentence is now within the statutory range provided by OCGA § 16-5-21 (b), his sentence is not void. See *Jones v. State*, 278 Ga. 669, 670 (604 SE2d 483) (2004) ("When the sentence imposed falls within the statutory range of punishment, the sentence is not void[.]"). We accordingly affirm Appellant's sentence of 20 years for the aggravated assault of Olson.[3]

*Judgment affirmed. All the Justices concur, except Pinson, J., not participating.*

---

[3] Nothing in this opinion shall prohibit the trial court on remittitur from taking any additional steps to convey the corrected sentence to the Department of Corrections.