**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: May 6, 2025

S25A0275.  CARRILLO v. THE STATE.

PETERSON, Chief Justice.

Jose Carlos Carrillo challenges his 2021 convictions for felony murder and other crimes in connection with the shooting death of Shawn Rhinehart and the non-fatal shooting of Robert Reeves. Carrillo's sole enumeration of error is that he was denied the effective assistance of counsel for failing to object to the admission of certain text messages and for failing to renew his objection to the search warrant executed at his home and the evidence discovered therein. Carrillo has failed to show that any deficiency in failing to object to the admission of the text messages prejudiced him or that counsel acted deficiently in failing to renew the objection to the

search warrant and discovered evidence. Accordingly, we affirm.[1]

1. The evidence at trial showed the following.[2] On October 8, 2017, Rhinehart and Reeves were at a park playing basketball

---

[1] The shooting occurred on October 8, 2017. On May 16, 2018, a Chatham County grand jury indicted Carrillo and Archie Marion Bryant for malice murder (Count 1), two counts of felony murder, predicated on the aggravated assault of Rhinehart and the possession of a firearm by a First-Offender Probationer (Counts 2-3), and two counts of aggravated assault (Counts 4-5); Carrillo was separately indicted for possession of a firearm by a First-Offender Probationer (Count 6). Carrillo was tried separately at a trial from September 14 to 20, 2021, and the jury found him guilty of all counts except Count 1. The trial court sentenced Carrillo to serve life in prison for Count 2 and a consecutive term of twenty years for Count 5. The trial court purported to merge Count 3, which was predicated on Count 6, into Count 2. On September 29, 2021, Carrillo filed a motion for new trial, which he amended with new counsel. After an evidentiary hearing, the trial court entered an order denying the motion on May 18, 2023. Carrillo filed a timely notice of appeal, and the case was docketed to the term of this Court beginning in December 2024 and submitted for a decision on the briefs. According to Carrillo's trial counsel at the hearing for the motion for new trial, Bryant negotiated a plea deal to a reduced charge prior to his trial.

Under *Malcolm v. State*, 263 Ga. 369, 371-374 (4), (5) (434 SE2d 479) (1993), the State correctly argues that because the trial court failed to vacate Count 3, it erroneously merged Count 6 into the vacated Count 3, and as a result, the trial court failed to sentence Carrillo for Count 6, a crime for which he was found guilty and properly should have been convicted. But this merger error benefits Carrillo, and the State failed to raise this merger issue by cross-appeal and this case does not present an exceptional circumstance, so we decline to exercise our discretion to correct the erroneous merger of Count 6. See *Marshall v. State*, 309 Ga. 698, 700-701 (2) (808 SE2d 696) (2017).

[2] Because this case involves questions of prejudice under *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984), we set out the evidence in detail, rather than recounting it in the light most favorable to the jury's verdicts. See *Moore v. State*, 315 Ga. 263, 264 n.2 (1) (882 SE2d 227) (2022).

2

when Carrillo arrived and, without articulating a reason why, said that he wanted to fight Rhinehart and pointed at Rhinehart "[a]s if [Carrillo] had a gun" in his hand. Rhinehart appeared "shocked[] [and] scared" when he saw Carrillo. Rhinehart and Reeves left the park immediately in Reeves's silver sedan; Rhinehart was in the back seat of the car while Reeves drove. Around the time Rhinehart and Reeves left the park, video surveillance footage from a nearby gas station showed an orange sports car pulling alongside a car that investigators believed to be Reeves's silver sedan at an intersection. As Reeves drove, he saw the orange sports car in his rearview mirror, speeding closely behind him. Rhinehart urged Reeves to speed up, and when Reeves did, shots were fired. Reeves could not see anyone in the orange sports car, could not say how many people were in the car, and could not see who was shooting. Reeves testified, however, that he and Rhinehart had been shot and that he heard seven or more gunshots fired from behind his car. Reeves also asserted that neither he nor Rhinehart possessed a weapon and that neither of them fired shots out of the window while driving away

3

from the orange sports car.

One witness testified that he was at home around 6:30 p.m. on October 8 when he heard between seven and nine gunshots. His back was to the window when he heard the shots, so he did not see who was shooting, but he stated that when he turned around, he saw two cars speeding by his home. The car in front was a "white, compact car," and an orange sports car was following behind it. The witness further testified that the gunshots stopped when the cars reached his property line and that he believed only one gun was being fired.

After being shot, Reeves drove to his grandmother's house nearby. When he got there, he immediately got out of the car, believing Rhinehart had also gotten out at the same time, and told his grandmother that he had been shot. His grandmother took him to the hospital in her car.

After receiving 911 calls from Reeves's mother, police arrived at his grandmother's house. Police found Rhinehart's dead body in the backseat of Reeves's car; Reeves's car was riddled with bullet

holes. Rhinehart's death was ruled a homicide caused by gunshot wounds to the chest and back of his right arm. One bullet was recovered from Rhinehart's right arm, and another bullet was removed from Reeves's lower back at the hospital and three bullets from his car. At the crime scene, investigators found nine 9mm Aguila brand shell casings that appeared to have been recently fired.[3]

Based on statements from Reeves and others, investigators identified Carrillo as a person of interest. During an interview with investigators, Carrillo denied, among other things, being at the park the day the shooting took place, being involved in the shooting, being around any of his friends the weekend of the shooting, being in possession of a firearm, and knowing anyone who drove an orange sports car.[4] Carrillo also stated during the interview that "[he] had

---

[3] There was an additional .45-caliber shell casing found in the area. The shell casing appeared to be rusted, suggesting to investigators that the shell casing had been in the area prior to the shooting involving Reeves and Rhinehart taking place.

[4] After investigators showed Carrillo a photo of him standing next to an

5

a feelin[g] . . . that [investigators] were [going to] come get [him]." Carrillo appeared to be referencing that in 2015, Javon Wilson, whom Carrillo described as his "little brother," was killed. Investigators initially suspected that Rhinehart might have been involved in Wilson's death, but eventually cleared him as a person of interest.[5] Accordingly, Carrillo explained that "[b]ecause it's just you know, the boy got killed . . . and I mean, the only people they gonna come after is . . . any close friends of Javon, Javon family . . . 'cause they think . . . we lash out to do it . . . ." There was also evidence of several Facebook posts made by Carrillo memorializing Wilson, stating, among other things, "d**n I miss you lil bruh . . . . You always h[e]ld it down when I was gone, so that's what I'm gonna do" and "it been two years since a p**sy boy took my brother from

---

orange sports car from Carrillo's public Facebook account, Carrillo contended that he had never been in that car and did not know who it belonged to. Based on a partial tag seen in the Facebook photo, investigators determined that the car belonged to Carrillo's co-indictee, Archie Bryant, who was also in the Facebook photo, standing next to Carrillo.

[5] Investigators handling Wilson's case initially believed that Rhinehart was involved in Wilson's killing, as Rhinehart was the victim of an armed robbery in which his phone was taken, and Wilson's death was believed to have occurred in an effort to recover that phone.

me."

While Carrillo was being interviewed, his home was searched pursuant to a search warrant. At his home, investigators discovered a Glock 17 9mm handgun in a tool bag with the name "Jose C" written on it and one 9mm Aguila brand round. Investigators also conducted a search of Reeves's grandmother's home pursuant to a search warrant. During that search they found a 9mm pistol, seven 9mm rounds, 26 5.6mm rounds, six .38 special rounds, and 20 Winchester 30/30 rounds. No firearm was found matching the Winchester rounds, and investigators did not find any Aguila brand rounds. Reeves claimed that none of the firearms and ammunition found at his grandmother's home belonged to him. Carrillo was eventually arrested and tried for malice murder, two counts of felony murder (predicated on the aggravated assault of Rhinehart and the possession of a firearm by a First-Offender Probationer), two counts of aggravated assault for the non-fatal wounding of Reeves, and possession of a firearm by a First-Offender Probationer.

At trial, a ballistics expert[6] testified that she concluded within a reasonable degree of scientific certainty that the Glock 17 9mm handgun found in Carrillo's home fired the nine Aguila brand shell casings recovered from the scene of Rhinehart's murder, the bullets found in Reeves's car, the bullet recovered from Reeves's back, and the bullets found in Rhinehart's body. Moreover, a DNA analyst from the GBI testified that the DNA found on the Glock 17 9mm handgun matched Carrillo's DNA and the match to Carrillo was "approximately thirty billion times more probable than a coincidental match to an unrelated person in the population."[7]

There was also evidence admitted at trial showing text messages on the day of the shooting between Carrillo and his child's

---

[6] The ballistics expert who testified was asked to resign from the GBI prior to trial because she had a high peer review rejection rate, involving "typos in her work." She confirmed that her resignation was not due to the quality of her work or the scientific certainty of her conclusions, but only the quality of the actual reports she produced. Notwithstanding this, the State also called a former GBI ballistics expert who, after completing similar tests, reached the same conclusions.

[7] The firearm had a mixture of detectable DNA from at least two individuals. The DNA analyst testified that mixed DNA was common and that results obtained from examinations of subjects involving mixed DNA for later comparison were not less reliable than if there were only a single source of detected DNA.

mother, Danequa Loadholt, who also went by "Neka." At 6:50 p.m. on the day of the shooting, Carrillo's phone messaged Loadholt's phone asking, "Can I spend da night at ur house[?]"Loadholt's phone responded, "[W]hat's wrong," and "[W]hat u did Jose[?]"Carrillo's phone responded, "Neka just chill I just want to spend da time with u I miss u." Later that night at 10:25 p.m., Loadholt's phone sent the following message to Carrillo's phone:

> I guess you wasn't gonna text me idk, whatever. But you just keep doing dumb s**t . . . you ain't even had to do all that then gone lie to me and say "you going to hoop" . . . . I BEEEEEEEEN told you about doing dumb s**t with ur friends, . . . I'm frustrated cuz u never gets it[.]

Carrillo, from his sister's phone,[8] responded to Loadholt's phone:

> I really needed u tonight man u is always there for me I am just scared cuz I really don't want to lose u or [my child] I know I f**ked up neka I know bt how could I do anything neka dats my lil brudda man u know he was like my blood man I couldn't let it ride I'm sorry I won't do anything else man bt I really did

---

[8] Loadholt's phone consistently referred to the person the messages were being sent to as "Jose," and a message sent from Carrillo's sister's phone to Loadholt's phone to "call my phone really quick I'm finna give [Carrillo's sister] her phone" suggested that Carrillo was the person using his sister's phone to send messages to Loadholt's phone.

need u tonight bt I'm sorry[.]

2. Carrillo raises two claims of ineffective assistance of counsel. We conclude that, as to the first claim, Carrillo has not shown prejudice and, as to the second claim, Carrillo has not shown that counsel performed in a constitutionally deficient manner.

To prove his claim of ineffective assistance of counsel, Carrillo must prove both that his attorney's performance was professionally deficient and that the deficiency resulted in prejudice to Carrillo's case. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). If Carrillo fails to meet the burden of proving either prong of the *Strickland* test, "we need not examine the other prong." *Moore v. State*, 307 Ga. 290, 298 (6) (835 SE2d 610) (2019) (citation omitted).

To establish deficient performance, Carrillo must show that his attorney's acts or omissions were objectively unreasonable, considering all the circumstances at the time and in the light of prevailing professional norms. See *Strickland*, 466 U.S. at 687-690. To establish the required prejudice, Carrillo must show that but for

his attorney's unprofessional errors, there is a "reasonable probability" that the result of the proceeding would have been different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo." *Payne v. State*, 314 Ga. 322, 329 (3) (877 SE2d 202) (2022) (citation omitted).

(a)    Carrillo argues that his trial counsel provided ineffective assistance by failing to object to the text messages Loadholt's phone sent to Carrillo's phone. Specifically, Carrillo contends that the message sent from Loadholt's phone at 10:25 p.m. on the night of the shooting, regarding her frustration with Carrillo for "doing dumb s**t with [Carrillo's] friends . . . [,]" was admitted in support of Carrillo's guilt and that trial counsel should have objected on the ground that the text messages were inadmissible hearsay.

Without deciding whether Carrillo's trial counsel was deficient for failing to object on hearsay grounds to incoming text messages

11

from Loadholt's phone, Carrillo cannot show prejudice on this claim because there was other overwhelming evidence supporting Carrillo's guilt. Particularly, the gun used in Rhinehart's shooting was found in Carrillo's home in a tool bag that was labeled "Jose C." Moreover, DNA found on that gun was "approximately thirty billion times more probable [to be a match to Carrillo] than a coincidental match to an unrelated person in the population." There was also evidence showing that the shell casings found at the scene and bullets found in Reeves's car, Reeves's back, and Rhinehart's body were fired from the weapon found in Carrillo's tool bag. Finally, Carrillo's message to Loadholt's phone on the day of the shooting, which was admissible as an admission by a party opponent, see OCGA § 24-8-801 (d) (2) (A) ("Admissions shall not be excluded by the hearsay rule. An admission is a statement offered against a party which is: . . . [t]he party's own statement . . . ."), implies his guilt. That message stated, in part, "I know I f**ked up." And Carillo's other remark to Loadholt's phone that "dats my lil brudda man u know he was like my blood man I couldn't let it ride"

suggested that Carrillo understood the significance of shooting Rhinehart and Reeves but believed it was necessary to avenge Wilson's death. See *Turner v. State*, 308 Ga. 537, 540-541 (2) (a) (842 SE2d 40) (2020) (concluding that the defendant could not show the required prejudice for his ineffective assistance of counsel claim because of other properly admitted evidence of his guilt). This claim of ineffective assistance of counsel therefore fails.

(b) Carrillo next argues that his trial counsel provided ineffective assistance by failing to renew his objections to the search warrant permitting investigators to search Carrillo's home and the evidence obtained from that search. Prior to trial, Carrillo's trial counsel filed a motion to suppress evidence obtained pursuant to a search warrant of Carrillo's home and argued that the search warrant was not supported by probable cause. The trial court denied Carrillo's motion to suppress. When the challenged evidence was admitted at trial, trial counsel did not object.

On appeal, Carrillo does not contend that the search warrant was not supported by probable cause or that the trial court erred in

denying his motion to suppress. Instead, he argues only that trial counsel waived these issues for appellate review by failing to renew his objection to the evidence obtained under the warrant. But trial counsel did not need to renew his objection in order to preserve the issues. "Once the court makes a definitive ruling on the record admitting or excluding any evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve such claim of error for appeal." OCGA § 24-1-103 (a). Therefore, trial counsel's failure to make a renewed objection did not constitute deficient performance, and the issues are preserved. See *Rashad v. State*, 318 Ga. 199, 209 (3) (a) (897 SE2d 760) (2024). We do not reach the merits of these issues, however, because Carillo does not independently raise them on appeal. Thus, Carrillo's ineffective assistance claim fails.

*Judgment affirmed. Warren, PJ, and Bethel, Ellington, McMillian, LaGrua, Colvin, and Pinson, JJ, concur.*