**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0049
Bennett
v.
The State

and

No. S26A0226
Kates
v.
The State

On Appeal from the Superior Court of Glynn County
No. CR2100241

Decided: May 5, 2026

COLVIN, Justice.

Everett Bennett and Travis Tyrone Kates appeal from their convictions for malice murder and possession of a firearm during the commission of a felony in connection with the shooting death of Antonio Randolph.[1] On appeal, Kates challenges the sufficiency of the evidence supporting his convictions as a matter of

---

[1] The crimes occurred on July 22, 2019. On November 20, 2019, a Glynn County grand jury indicted Bennett, Kates, and Ethan Bennett ("Ethan"). The co-indictees were reindicted on July 14, 2021, October 13, 2021, and finally on December 15, 2021. The final indictment, on which Bennett and Kates were later tried (Indictment No. CR-2100241), jointly charged Bennett,

Kates, and Ethan with malice murder (Count 1), felony murder (Count 2), aggravated assault with a deadly weapon (Count 6), and possession of a firearm during the commission of a felony (Count 7). The co-indictees were also separately charged with felony murder in Count 3 (Kates), Count 4 (Ethan), and Count 5 (Bennett). Bennett and Ethan were jointly charged with simple battery (Count 8). Kates and Bennett were separately charged with possession of a firearm by a convicted felon (Counts 9 and 11, respectively). And Ethan was separately charged with possession of a firearm by a first offender probationer (Count 10).

The trial court severed Ethan's case. Ethan was tried first, and a jury found him guilty. A jury trial was then held for Bennett and Kates on Indictment No. CR-2100241 from February 28 through March 3, 2022. The trial court granted Bennett's motion for a directed verdict as to the simple-battery count (Count 8). The court presented to the jury a "dummy" version of Indictment No. CR-2100241, which removed the simple-battery count (Count 8), removed the counts naming only Ethan (Counts 4 and 11), and renumbered the counts. As relevant here, Counts 6, 7, and 9 of the indictment corresponded, respectively, to Counts 5, 6, and 8 of the "dummy" indictment.

The jury found Bennett and Kates guilty of all counts against them, except for the simple-battery count, which had been removed from their consideration. Following the jury verdict, the trial court nol prossed the indictments against Bennett and Kates that the grand jury had returned before Indictment No. CR-2100241.

The trial court entered final dispositions for Bennett and Kates that used the count numbers from Indictment No. CR-2100241, rather than the count numbers appearing on the "dummy" version of the indictment that was given to the jury. As to both Bennett and Kates, the trial court imposed sentences of life in prison with the possibility of parole for malice murder (Count 1) and five years consecutive for possession of a firearm during the commission of a felony (Count 7). The felony murder counts were vacated by operation of law, although, due to a scrivener's error, Bennett's final disposition sheet listed the vacated felony-murder counts as Counts 2 and 4, rather than as Counts 2 and 5. The trial court merged for sentencing purposes the remaining counts against Bennett (Counts 6 and 11) and against Kates (Counts 6 and 9).

Bennett timely filed a motion for new trial on March 20, 2022, and amended the motion through new counsel on July 2, 2024. Kates timely filed a motion for new trial on March 23, 2022, and amended the motion through new

2

constitutional due process and under Georgia's circumstantial-evidence statute; Kates and Bennett argue that the trial court abused its discretion in admitting evidence regarding shell casings collected when officers responded to a prior shots-fired call involving Kates; Bennett raises several ineffective-assistance-of-counsel claims; Bennett also argues that cumulative prejudice from the trial court error and instances of ineffective assistance of counsel warrant a new trial; and Kates argues that scrivener's errors on his final disposition should be corrected. As explained below, we affirm Appellants' judgments of conviction.

1. The trial evidence showed the following. Randolph (the victim of the shooting) was a drug dealer and addict who lived in the Arco area of Brunswick. About three years before he died, Randolph started dating Jennifer Ahnberg, the mother of several children, including Appellant Bennett and his younger brother, co-indictee Ethan Bennett ("Ethan"). Kates had been friends with the Bennett brothers for many years. And Bennett and Ethan knew and had spent time with Randolph.

Randoph and Ahnberg's relationship revolved around drugs, primarily methamphetamine. Shortly after they started dating, the two moved to Savannah for a two-year period. Randolph and Ahnberg continued using methamphetamine in Savannah and ended up living in a homeless encampment under a bridge. At trial, Ahnberg recounted a time when she and Randolph got into an argument, and he abandoned her while she was

---

counsel on April 28, 2024. Following hearings on the motions, the trial court entered an order denying Bennett's motion for new trial on June 25, 2025, and an order denying Kates's motion for new trial on August 27, 2025. Bennett and Kates timely filed notices of appeal directed to this Court. The cases were docketed to this Court's term beginning in December 2025 and submitted for decisions on the briefs.

3

using a needle to inject methamphetamine into her arm. Sometime after that incident, Randolph left Ahnberg in Savannah and returned to Brunswick.

About two months later, Randolph traveled to Savannah and brought Ahnberg back to Brunswick, where they resumed their relationship. During the next year, Randolph and Ahnberg were homeless and would sleep either outside Randolph's mother's house or in a nearby abandoned house.

About a month before the shooting, Ahnberg broke up with Randolph and started dating Lewis Ramsey, a "crack" cocaine addict, who introduced Ahnberg to the drug. After the breakup, Ahnberg continued living in the abandoned house, and Randolph stayed outside his mother's house much of the time. Ramsey and Randolph were friendly, and Ahnberg continued regularly using drugs with Randolph.

Ahnberg testified that Bennett and Ethan, who knew she was on drugs, "were upset because of how [she] looked and the drug use." And a text message sent from Randolph's phone to Ahnberg's friend in the month leading up to the shooting noted that the sender, who identified herself in a message as "Jennifer ahnberg," was "hungry[,] dirty[,] skinny[,] and sweating while mosquito[s] eat me up in a[n] abandon[ed] house," that "Ethan [had] move[d] back yesterday [and] seen me," and that "his heart is so broke[n] [over] how I look."

The trial evidence indicated that Bennett and Ethan blamed Randolph for Ahnberg's drug addiction and for abandoning her in Savannah. Ramsey testified that Ahnberg had told her sons that Randolph left her when something went wrong while she was injecting "meth" in Savannah. And in her police interview, which was played for the jury, Bennett's girlfriend, Terriana Mullen, said that Bennett and Ethan were upset with Randolph

4

because he had "drugged [their] momma up real bad and just left her" with a needle in "her arm." Mullen also testified at trial that Bennett told her that he and Ethan thought Randolph was responsible for their mother's drug addiction. And although Ahnberg denied at trial that there was a "beef" between her sons and Randolph, she testified that Bennett and Ethan had "confronted" Randolph about Ahnberg's drug use.

Randolph was shot and killed late on July 22, 2019. Ahnberg and Randolph's mother each testified that, around noon that day, they saw a tan-colored car parked near Randolph's mother's house. Ahnberg testified that the car belonged to Bennett's girlfriend (Mullen), and that Mullen, Bennett, and Ethan were in the car. Although Ahnberg did not recall seeing Kates, whom she had known when he was "little," Randolph's mother testified that Kates, whom she had seen on a prior occasion, was also in the car.

Ahnberg testified that her sons stopped by for a brief conversation with her before leaving. According to Ahnberg, at that time, she had been up for several days smoking "crack" and "looked bad, really bad." And she said that, later in the day, Bennett and Ethan, who had previously taken her to a rehabilitation center called "Gateway," "called [her] back about going to rehab" again.

Mullen testified that, in the afternoon on the day Randolph was killed, she drove Bennett, Kates, Ethan, and a friend named Devin to Statesboro in her Toyota Camry, which the record shows was tan/gold in color. Mullen said that they returned to Brunswick later that afternoon.

According to Ahnberg, that night Bennett and Ethan stopped by to check on her "a couple of times" because they planned to take her to a rehabilitation center the next morning

5

and wanted to make sure they knew where she would be. Ahnberg testified that, "[s]ometime that evening," she and Randolph got into the tan car with Bennett and Ethan and asked for a ride to the store so Randolph could get cigars for "blunts." But Bennett refused to take them because he did not want Ahnberg to get "high," so Ahnberg and Randolph got out of the car.

Ahnberg said that she saw her sons again later that night. And Ramsey recalled that Bennett, Ethan, Kates, and another male came by in a "gold" car. Ramsey testified that Ahnberg told her sons, "[D]on't hurt him [Randolph] so bad." And the State played for the jury a portion of Ahnberg's police interview in which she said that she told her sons "not to hurt him [Randolph], period." Although Ramsey could not specifically recall at trial what Ahnberg's sons had said in response, he testified that, during his police interview, he had reported that one of Ahnberg's sons responded, "[N]o, f**k that, he left you for dead." And Ahnberg testified that, at some point, her sons drove away in Mullen's car.

Mullen testified that she had been staying with Bennett at Bennett's father's house in Brunswick, and that she was there with Bennett, Kates, Ethan, and Devin on the night of the shooting. Mullen admitted that she lent her car to Bennett around 11:00 that night, and that Bennett took Kates, Ethan, and Devin with him. Just before midnight, both Randolph's mother (who was inside her own house) and Ahnberg (who was in the abandoned house a street over) heard several gunshots. Surveillance video from a camera down the street from Randolph's mother's house captured a portion of the shooting from a distance. The video, which was played for the jury, showed two figures stepping into view, one of the figures running across the street toward Randolph's mother's house, and a flash consistent with a gunshot

6

from the location of the other figure.

Ramsey testified that, after the gunshots rang out, Ahnberg "blurted … out" either "[T]hey just killed Antonio [Randolph]" or "[T]hey just shot … Antonio [Randolph]." And Ahnberg similarly testified that she remembered saying to Ramsey, "[T]hey're shooting and I hope it has nothing to do with Antonio [Randolph]."

Ahnberg testified that, sometime after she heard the gunshots, she called Bennett, who said that he was on his way to their father's house, where he lived, and that he was "almost there." Mullen testified that Bennett, Kates, Ethan, and Devin returned to Bennett's father's house with her car around 1:00 a.m. Mullen then drove the men to Ethan's girlfriend's house, where she dropped off Ethan and Devin. Ethan's girlfriend testified that Ethan and Devin came to her house around 1:00 or 2:00 a.m. and appeared "nervous, sweaty, [and] a little dirty." Mullen then drove Kates to his residence.

After dropping off Kates, Mullen started driving Bennett to her cousin's house, where they were going to stay for the night. But on the way, around 2:00 a.m., a police officer stopped Mullen's car near a hospital because her headlights were off. Video of the traffic stop captured on the officer's body camera, which was played for the jury at trial, showed that Bennett was sitting in the back seat of Mullen's car. And a recording of Mullen's subsequent police interview, which was played for the jury, showed that she told the detective that, when the police officer pulled her over, Bennett kept saying, "It's over, it's over."

At trial, Mullen also admitted telling a detective that, at some point, Bennett told her "something" or "something bad" had "happened to his mom's boyfriend," whom Mullen understood to be Randolph. And Mullen testified that, following the traffic stop,

7

she drove Bennett to her cousin's house, where they stayed for the night.

Shortly after the shots were fired, officers responded to the roadway in front of Randolph's mother's house, where they found four 9mm shell casings, some of which were MKE-branded. But officers did not locate Randolph's body at that time. Around 8:30 in the morning, Randolph's sister found Randolph lying dead on the ground near Randolph's mother's house. Randolph had been shot four times from behind, and the medical examiner testified that his cause of death was multiple gunshot wounds.

Sergeant Gary Scott Coleman testified that MKE is a Turkish brand of ammunition that, though commercially available, is "very rare" in the United States. The State also introduced evidence indicating that Kates had previously possessed MKE ammunition. Specifically, Kates's mother testified that, on June 8, 2019 (about six weeks before Randolph's shooting), gunshots rang out near her house shortly after Kates, who had been sitting outside her house, had left to buy a cigar, and that Kates "didn't never come back." And an officer testified that, in response to a shots-fired call, he went to Kates's mother's house, where he located three MKE-branded, 9mm shell casings "in front of and to the side of [a] chair" that Kates's mother reported Kates had been sitting in when the gunshots occurred.

Pursuant to search warrants, officers later searched the phones of Ethan and Kates. With the benefit of testimony from Officer Antonio Hurst, who explained the meaning of certain slang terms, a text-message exchange between Ethan and a contact listed in Ethan's phone as "Bro" (which, as explained below, the evidence indicated was Bennett), showed the following. In text messages between July 16 (a week before the shooting) and the early morning of July 23 (shortly after the shooting), Ethan

8

referred to having a gun, saying, "I got my 40," "Glock s**t." Using the term "slide" (which means having "shot at somebody") and the term "federal" (which refers to law enforcement surveillance), Bennett said he "just slide the other night" and "hit the whole house up," to which Ethan responded, "Talking too much over the phone, Federal[ ]." Bennett said he "took momma to gateway," and Ethan responded, "S**t broke my heart to see her like that." Invoking the nickname of Bennett's girlfriend ("Tiggy"), Bennett then said, "Ik[.] I cried on tiggy the same night I saw her … I couldn't look her in her eyes." And Ethan responded, "Me either." Then, using the word "bless" (which means "t[aking] care of [an] individual" by causing their "death," "beat[ing] them up," or "robb[ing] them"), Ethan made an apparent reference to the victim (Antonio Randolph), saying, "[G]otta bless tonio b***h a**." Bennett then made an apparent reference to his earlier comment about having shot at a house the other night, responding, "Lol[,] who house u think I did that to[?]" And using the word "opp" (an abbreviation for "opponent"), Bennett further said, "But he wasn't there so ima double back[.] I gotta find him lol[.] [H]e my favorite opp."

In text messages between Ethan and "Bro" (Bennett) starting at 1:09 on July 23 (shortly after the shooting and shortly before Mullen was pulled over near a hospital for having her headlights off, while Bennett was in the car), Bennett texted, "Yall straight[?]" And Ethan responded, "Yea." Soon after, Bennett texted, "They pulled us over because … her lights wasn't on all the way." Ethan responded, "Noo where y'all at[?]" And Bennett said, "[B]y the hospital[.]" Using the word "tweakin" (which means being "scared"), Ethan then texted, "I'm tweakin." And Bennett responded in relevant part, "U trippin but we good[.]"

On Kates's phone, officers found social media messages

9

sent from Kates's account, including messages from the day of the shooting that said Kates was in Statesboro at 12:54 p.m. and was on his way back at 6:44 p.m. Messages on Kates's social media account from the night of, and day following, the shooting included a message from Kates at 12:16 a.m. that said, "Thug pull up on me"; a message sent to Kates at 11:32 a.m., which included a news article regarding an "Arco death investigation follow[ing] [a] report of gunfire"; a message from Kates to Bennett's girlfriend (Mullen) attempting to get into contact with Bennett at 12:05 p.m.; a message from Kates at 6:19 p.m. saying, "Listen ok like fr listen ok i need to talk to u its a emergency"; and messages from Kates at 11:22 p.m. asking someone named Keith, "Man dam u heard Ethan and them booked[?]" and "U wiping[?]" Finally, in an exchange between Kates and a woman named Nesha a few days after the shooting, Kates said in relevant part, "one day ima be gone … u never know[,] i can go get 30 years or get killed fr." And Neesha responded, "First off your not going no where and if u got sunt to prison or die ill always be there."

Finally, the State played for the jury Kates's police interview. In his interview, Kates said that he was close with Bennett and Ethan, and that he had gone with them to Statesboro on the day of the shooting. But he denied any involvement in the shooting, said that he went home before 11:00 p.m. on the day of the shooting, that he got "real high" and fell asleep alone on his front porch before midnight, and that the next time he saw Bennett and Ethan was when they came to his house to pick him up around 4:00 or 5:00 a.m.

2. On appeal, Kates argues that the trial court erred in denying his motion for a directed verdict because the trial evidence was insufficient as a matter of constitutional due process to

prove that he was involved in Randolph's murder and was insufficient under Georgia's circumstantial-evidence statute to disprove the reasonable hypothesis that the Bennett brothers acted alone in shooting Randolph. We disagree. As explained below, the trial evidence was constitutionally sufficient to prove that Kates participated in Randolph's murder, at least as a party to the crime. See OCGA § 16-2-20(b)(3) (providing that a person is a party to a crime if he "[i]ntentionally aids or abets in the commission of the crime"). And the jury was authorized to reject as unreasonable the alternative hypothesis that the Bennett brothers acted alone without Kates's participation.

"The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction." *Washington v. State*, 320 Ga. 839, 844 (2025) (quotation marks omitted). When assessing the sufficiency of the evidence as a matter of constitutional due process,

> we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt for the crimes for which he was convicted. In making that determination, we put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the jury. As long as there is some competent evidence, even if contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.

*Rosenau v. State*, 321 Ga. 299, 303 (2025).

11

Additionally, under Georgia statutory law, "[w]hen a conviction is based solely on circumstantial evidence, the State must present sufficient evidence to exclude every other reasonable hypothesis save that of the guilt of the accused." *Clements v. State*, 321 Ga. 164, 168 (2025) (cleaned up). See also OCGA § 24-14-6. "We have explained, however, that not every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable." *Clements*, 321 Ga. at 168 (cleaned up). "Whether an alternative hypothesis is reasonable and whether it has been excluded by the evidence are questions for the jury," and "we will not disturb the jury's findings on those questions unless they are insupportable as a matter of law." Id. at 168–69 (quotation marks omitted).

"Where, as here, the defendant is charged as a party to the crime, conviction requires proof that the defendant shared a common criminal intent with the direct perpetrators of the crimes." *Grant v. State*, 319 Ga. 490, 493 (2024) (quotation marks omitted). While "mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime[,] … a jury may infer a common criminal intent from the defendant's presence, companionship, and conduct with other perpetrators before, during, and after the crimes." Id. (cleaned up).

Here, the trial evidence was constitutionally sufficient to authorize a jury finding beyond a reasonable doubt that Kates shared a common criminal intent with the Bennett brothers and participated in Randolph's murder. It is undisputed on appeal that the trial evidence showed that Bennett and Ethan had a motive to harm Randolph, whom they blamed for their mother's drug addiction. And text messages from Ethan's phone showed that Bennett and Ethan planned to "bless" (harm or kill) Randolph.

12

Ramsey testified that, on the night of the shooting, Kates was present when Ahnberg instructed the Bennett brothers not to harm Randolph and the Bennett brothers rebuffed Ahnberg's directive, which supported an inference that Kates knew about the plan to harm Randolph. See *Rosenau*, 321 Ga. at 305 (explaining that "the jury could reasonably infer that [the defendant] shared [a co-defendant's] criminal intent from," among other things, "testimony that [the defendant] was present for a conversation about robbing [people]"). Because Mullen testified that Kates departed with the Bennett brothers shortly before the shooting and returned with them shortly after the shooting, the jury was authorized to find that Kates accompanied the Bennett brothers as they carried out their plan to harm Randolph. See *Kelley v. State*, 248 Ga. 133, 134–35 (1981) (holding that the trial evidence was constitutionally sufficient where, among other things, "witnesses placed [the defendant] in the company of [a participant in the crimes], both before and after the robbery and shooting"). And the testimony that the MKE ammunition used in Randolph's shooting was "very rare," and that the same kind of "very rare" MKE shell casings were found where Kates had been during a prior shooting incident, supported an inference that Kates either personally shot Randolph or provided the ammunition used to do so. See *Gartrell v. State*, 304 Ga. 809, 812 (2018) (holding that the evidence was constitutionally sufficient where, among other things, the defendant "possessed the same type of ammunition as the projectile that was recovered from [the victim's] body, which was also consistent with the cartridge casing found at the scene).

Finally, the trial evidence authorized the jury to find that Kates was "conscious of his guilt, and therefore guilty of" the charges against him. *Sharkey v. State*, 320 Ga. 477, 481 (2024). Specifically, because Mullen testified that she saw Kates with the Bennett brothers during the timeframe Kates told police he was

13

"high" and asleep on his front porch, the jury was permitted to infer that Kates lied to the police about his whereabouts during the shooting to hide his participation in the crimes. See *Douglas v. State*, 321 Ga. 739, 746 (2025) (noting that the defendant's "lies to … law enforcement about what happened … could [be] construe[d] as evidence of consciousness of guilt"); *Bates v. State*, 317 Ga. 809, 816 (2023) (noting that the defendant "lied to police that he was texting when the crimes occurred, from which the jury could infer that he was trying to hide his own participation"). And Kates's social media messages showed that, after the crimes occurred, Kates expressed that he would "be gone" one day and could "get 30 years or get killed," which authorized the jury to find that Kates knew he was guilty and feared being caught and punished for a capital offense. See *Jenkins v. State*, 303 Ga. 314, 315–16 (2018) (concluding that the evidence supported the defendant's conviction for murder and other offenses where, after a shooting occurred, the defendant said, "I don't want to go to jail").

Accordingly, the trial evidence was sufficient as a matter of constitutional due process to establish that Kates was at least a party to the crimes. And although this evidence was circumstantial, the jury was authorized to reject as unreasonable Kates's alternative hypothesis that the Bennett brothers committed the shooting alone, without Kates's participation. This is particularly true because Mullen's testimony about seeing Kates shortly before and after the shooting, which the jury was authorized to believe, conflicted with Kates's claim that he was alone on his front porch at the time. See *Peacock v. State*, 314 Ga. 709, 714 (2022) (concluding that the jury was entitled to reject the defendant's alternative hypothesis as unreasonable where the defendant told "stories that conflicted with other evidence").

3. Bennett and Kates argue that the trial court abused its

14

discretion in admitting, over their objection, evidence from Kates's mother and an officer showing that, in response to a shots-fired call on June 8, 2019 (about six weeks before Randolph's shooting), the officer found MKE-branded shell casings near a chair where Kates had been sitting. Specifically, Kates's mother testified at trial that, on June 8, 2019, Kates was sitting outside her house and told her he was going to leave to buy a cigar, that sometime after "[h]e was supposed to been going" to buy the cigar and "had done left" she heard gunshots, that Kates "didn't never come back," and that officers later recovered shell casings in her neighbor's yard. And the responding officer testified that Kates's mother told him Kates had been sitting outside in a chair next to the road when the gunshots occurred, and that he recovered three MKE-branded, 9mm shell casings "in front of and to the side of the chair." The trial court ruled that this evidence was intrinsic to the charged offenses because it linked Kates to Randolph's shooting, which also involved use of MKE ammunition,[2] and that the danger of unfair prejudice did not substantially outweigh its probative value. On appeal, Bennett and Kates argue again that the evidence was inadmissible under OCGA § 24-4-404(b) ("Rule 404(b)") and OCGA § 24-4-403 ("Rule 403"). This claim fails, however, because, as explained below, the trial court properly determined that the testimony regarding the prior shots-fired call was intrinsic evidence not subject to Rule 404(b) and that the evidence was not inadmissible under Rule 403.

---

[2] Sergeant Coleman testified at trial that Walmart had a deal to carry Turkish-made MKE ammunition in 2013, but that the deal went "south." He further testified that, although MKE ammunition remained commercially available in the United States, it was "very rare." And he said that, although he had submitted thousands of shell casings to the National Integrated Ballistics Identification Network over the years, he had only seen MKE ammunition used in a total of two Glynn County cases.

15

Rule 404(b) provides in relevant part that "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith." OCGA § 24-4-404(b). "This rule applies only to extrinsic evidence of other crimes, wrongs, or acts." *Pierce v. State*, 319 Ga. 846, 856 (2024) (quotation marks omitted). "Intrinsic evidence of a charged offense is not subject to Rule 404(b) and remains admissible even if it incidentally places the defendant's character at issue." Id. (cleaned up).

"The line between extrinsic and intrinsic evidence is not always a bright one, but, as a general matter, 'intrinsic evidence' refers to direct evidence of the charged crime, as opposed to evidence of other crimes." *Pierce*, 319 Ga. at 856 (cleaned up). "Evidence pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted as intrinsic evidence if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *Harris v. State*, 310 Ga. 372, 378 (2020) (cleaned up). "[W]hen we consider what evidence is necessary for the State to complete the story of the crime, 'necessary' is not used in a strictly literal sense, but rather, refers to what evidence is reasonably necessary for the State to complete the story of the crime." Id. at 379.

Here, the testimony regarding the shots-fired call six weeks before Randolph's shooting—which supported a finding that Kates previously possessed a gun and the same, "very rare" type of foreign-made ammunition used in Randolph's shooting—was "intrinsic evidence" that was "reasonably necessary to complete the story of the crimes for the jury" because it "added significant weight to the State's theory that" Kates was either "the

16

shooter in this case" or had supplied the ammunition used to shoot Randolph. *Ealey v. State*, 322 Ga. 509, 518 (2025) (cleaned up) (holding that "evidence showing that [the defendant] owned and possessed that same type of handgun [used to commit murders] several months before the murders" was admissible intrinsic evidence). See also *Felton v. State*, 322 Ga. 530, 542 (2025) (holding that "evidence showing that [the defendant] was in possession of multiple, colored-handled knives" a couple days after the murder was "intrinsic" evidence that was "'inextricably intertwined' with the evidence regarding [the victim's] death by sharp-force wounds," where the knives "appeared to come from the same knife set as" a knife and sheath found at the crime scene).

As intrinsic evidence, the testimony regarding the prior shots-fired call was not subject to the restrictions of Rule 404(b) but still had to satisfy Rule 403.[3] See *Ealey*, 322 Ga. at 518. Rule 403 provides in relevant part that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." OCGA § 24-4-403. Here, the testimony regarding the prior shots-fired call, which tied Kates to the ammunition used in the shooting, "had significant probative value" because there were no eyewitnesses to the murder, the State's case against Kates was "circumstantial [in] nature," and Kates "denied any involvement" in the shooting. *Ealey*, 322 Ga. at 519. See also *Lee v. State*, 318 Ga. 412, 419 (2024) (concluding that testimony that the defendant had previously been seen with the same kind of gun used in the murder was probative, and that the need for the evidence was great because the evidence of the defendant's guilt was circumstantial). And Appellants have not

---

[3] Because the evidence was intrinsic, "the State was not obligated to provide reasonable notice to the defense in advance of trial under Rule 404(b)." *Rouse v. State*, 322 Ga. 328, 337 (2025) (quotation marks omitted).

shown that any unfair prejudice from the evidence "substantially outweighed" its significant probative value. OCGA § 24-4-403. Evidence that Kates possessed MKE-branded ammunition and a gun "was not—on its own—*unfairly* prejudicial" but instead relevant, "inculpatory evidence" connecting him to Randolph's shooting. *Felton*, 322 Ga. at 543 (emphasis added). "And the prior incident, a shooting in which no one was hurt or prosecuted, was not unfairly inflammatory," particularly because the State did not introduce any evidence about the circumstances under which Kates fired the MKE-branded ammunition. *Flakes v. State*, 323 Ga. 477, 488–89 (2026). In short, there was little danger of the jury finding Kates guilty because he previously fired a gun rather than based on the trial evidence connecting him to Randolph's murder. See id. (holding that evidence of a prior shooting that linked the defendant to the murder weapon was admissible under Rule 403 where "[t]here was little danger of the jury finding [the defendant] guilty because he [previously] fired a gun … , rather than based on the [trial] evidence"). Accordingly, the trial court did not abuse its discretion in admitting the evidence.

4. Bennett raises several claims of constitutionally ineffective assistance of counsel. "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo." *Blocker v. State*, 316 Ga. 568, 578 (2023) (quotation marks omitted).

"To prevail on an ineffective-assistance-of-counsel claim, a defendant must show deficient performance and prejudice." *Washington*, 320 Ga. at 851. "Establishing deficient performance requires a defendant to demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." Id.

18

(quotation marks omitted). "There is a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." Id. (quotation marks omitted). "Overcoming that presumption requires an appellant to show that no reasonable lawyer would have done what his lawyer did or would have failed to do what his lawyer did not." Id. (cleaned up).

"To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." *Washington*, 320 Ga. at 851 (quotation marks omitted). And "[i]f the defendant fails to establish either deficient performance or prejudice, this Court need not examine the other requirement." Id.

(a) Bennett argues that his trial counsel was constitutionally ineffective for failing to object to testimony from Ramsey and Ahnberg about what Ahnberg said when, while she was inside the abandoned house a street over from the location of Randolph's shooting, she heard gunshots ring out. Specifically, at trial, Ramsey testified that, after the gunshots rang out, Ahnberg "blurted … out" either "[T]hey just killed Antonio [Randolph]" or "[T]hey just shot … Antonio [Randolph]." And when asked if she had said Bennett and Ethan had "just shot or killed Antonio [Randolph]," Ahnberg responded, "No, I did not. I don't recall. I don't remember saying that. I remember saying, [Ramsey], they're shooting and I hope it has nothing to do with Antonio." According to Bennett, trial counsel should have objected to this testimony because it was inadmissible under several rules of evidence and because the testimony was prejudicial, in that it suggested that Bennett's mother believed "he was capable of murder."

Assuming without deciding that the challenged testimony was inadmissible and that trial counsel was deficient for failing to object to it, Bennett has not shown prejudice because the other

19

evidence against him, though circumstantial, was strong. Testimony from Mullen and Ahnberg showed that Bennett was motivated to harm Randolph because he blamed Randolph for Ahnberg's drug addiction and poor physical condition, as well as for abandoning her in a vulnerable state in Savannah. Text messages between Bennett and his brother (Ethan) prior to the shooting showed that they planned to "bless" (harm or kill) Randolph, and that Bennett intended to "double back" to find and shoot Randolph, whom Bennett considered his "favorite opp" (opponent). Ahnberg admitted to police that she had instructed Bennett and Ethan not to hurt Randolph. And Ramsey's testimony supported a finding that, on the night of the shooting, the Bennett brothers rebuffed Ahnberg's instruction not to hurt Randolph "bad," with one of the brothers saying, "f**k that, he left you for dead." See *Evans v. State*, 322 Ga. 652, 664 (2025) (evidence showing that the co-defendants discussed committing a crime against the victim before the shooting occurred supported a determination that the evidence of guilt was overwhelming); *DeVanna v. State*, 312 Ga. 689, 696 (2021) (concluding that "the State presented an overwhelming amount of evidence of [the defendant's] guilt, including messages [the defendant] sent to multiple people in the week leading up to [the victim's] shooting saying that he wanted to kill [the victim] by shooting her in the head").

Mullen's trial testimony and statements to the police about the night of the shooting also showed that Bennett had participated in the shooting. Specifically, she testified that Bennett, Ethan, Kates, and another man left the Bennett brothers' father's house shortly before the shooting and returned shortly after. See *Evans*, 322 Ga. at 664 (witnesses' testimony that the defendant left his house with the co-defendants shortly before the shooting and return with them shortly after supported the conclusion that the evidence of guilt was overwhelming). She also indicated that

Bennett told her "something" or "something bad" had "happened to his mom's boyfriend [Randolph]" before the public knew about the murder. See id. (the defendant's rap lyrics reflecting knowledge of the crime supported a conclusion that the evidence of guilt was overwhelming). And according to statements Mullen made during her police interview, when a police officer pulled over her car shortly after the shooting, Bennett, who was sitting in the back seat, kept saying, "It's over, it's over"—statements that reflected an understanding of his culpability. See *Carrillo v. State*, 321 Ga. 453, 458–59 (2025) (holding that there was no prejudice from alleged deficient performance where, among other things, the defendant sent a message saying, "I know I f\*\*ked up," which "suggested that [the defendant] understood the significance of shooting" and "implie[d] his guilt").

Moreover, Ahnberg's statements about the shooting were not particularly inculpatory. This is because the statements suggested that "they" were involved in the shooting without specifically identifying the Bennett brothers as the culprits, and because Ahnberg did not personally witness the shooting, making her statements about who may have been involved in the shooting speculative.

Given that the above evidence "strongly supported" the guilty verdicts and that Ahnberg's statements were not particularly inculpatory, Bennett has not shown "a reasonable probability that the result of his trial would have been different" but for trial counsel's failure to object to testimony suggesting that his mother believed he shot Randolph. *Evans*, 322 Ga. at 666.

(b) Bennett argues that his trial counsel was constitutionally ineffective for failing to raise an authentication objection, under OCGA § 24-9-901 ("Rule 901"), to the admission of text messages found on Ethan's cell phone. Specifically, Bennett argues

21

that trial counsel should have objected on the ground that the State failed to adequately identify Bennett as the contact listed in Ethan's phone as "Bro." As explained below, however, Bennett has not established deficient performance because he has not shown that the trial court would have sustained an objection under Rule 901. See *Momon v. State*, 322 Ga. 848, 853 (2025) (explaining that the failure to show that an evidentiary objection "would have been successful … ends the deficiency inquiry").

Rule 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility shall be satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." OCGA § 24-9-901(a). And Rule 901(b) provides that one way evidence may be authenticated is by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." OCGA § 24-9-901(b)(4).

Here, the "contents" of the text messages, "taken in conjunction with circumstances," supported a finding that the contact identified as "Bro" was Bennett. OCGA § 24-9-901(b)(4). Given that the trial evidence established that Ethan was Bennett's younger brother, the fact that the contact listed as "Bro" referred to Ethan as "lil bru" suggested that "Bro" was Bennett. Text messages from "Bro" also made comments about "tiggy" (the nickname of Bennett's girlfriend, Mullen) and "mamma" (an apparent reference to Ahnberg, the mother of the Bennett brothers) that, when considered together with other evidence admitted at trial, suggested that "Bro" was Bennett. Specifically, one text message from "Bro" referred to "tiggy … be[ing] at the house 24/7," and Mullen testified at trial that, at the time, she was staying with Bennett at Bennett's father's house. "Bro" said in a later text message that he "cried on tiggy the same night [he] saw

22

[mamma]," which was consistent with Mullen's and Ahnberg's testimony that Bennett was upset about Ahnberg's condition. Another text message discussed having "t[aken] momma to gateway," which aligned with Ahnberg's testimony that her sons had previously taken her to a rehabilitation center called "Gateway." "Bro" also texted Ethan a picture of Bennett, Ethan, and Kates. Further, the trial evidence showed that, while Mullen was driving Bennett at about 2:00 a.m. on July 23 (after the just-before-midnight shooting on July 22), a police officer pulled her over near a hospital for not having headlights on. And text messages from the early hours of July 23 showed that "Bro" told Ethan that "[t]hey pulled us over" "by the hospital," and that "her lights wasn't on all the way."

In addition to relying on the contents of the text messages to "support a finding that the matter in question" (text messages from the contact listed as "Bro") were "what its proponent claim[ed]" (text messages from Bennett), OCGA § 24-9-901(a), the State also admitted independent evidence that the contact listed as "Bro" was Bennett. Specifically, the State introduced into evidence a social-media-message exchange between Kates and Mullen in which Mullen provided Kates with Bennett's phone number. And the phone number provided by Mullen matched the phone number assigned to the contact listed as "Bro" in Ethan's phone.

Because the State adequately identified the contact listed as "Bro" on Ethan's phone as Bennett, an objection on that basis would have been meritless. Accordingly, Bennett has not shown that his trial counsel performed deficiently by failing to raise such an objection. See *Hughes v. State*, 310 Ga. 453, 459 (2020) (no deficient performance where an argument that evidence "was not properly authenticated" was "meritless").

23

(c) Bennett argues that his trial counsel was constitutionally ineffective for failing to object to testimony from Officer Hurst explaining the meaning of certain slang terms used in the text-message exchange between Ethan and the contact listed in Ethan's phone as "Bro" (which, as described above, the evidence showed was Bennett). According to Bennett, Officer Hurst's testimony implied that Bennett was in a gang because Bennett and Ethan used terminology that gang members also use. And he contends that trial counsel should have objected because the testimony was "character evidence" that caused "prejudice." Based on Bennett's references to "character evidence" and "prejudice," we construe his argument as claiming that trial counsel should have objected to Officer Hurst's testimony under OCGA § 24-4-404(a) ("Rule 404(a)"), which provides in relevant part that "[e]vidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion," and Rule 403, which, as noted above, provides in relevant part that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." OCGA § 24-4-403. As explained below, we conclude that Bennett has not shown that his counsel rendered deficient performance in failing to raise objections under Rule 404(a) or Rule 403 because he has not shown that such objections would have been sustained. See *Momon*, 322 Ga. at 853.

By way of background, the State introduced testimony from Officer Hurst at trial to aid the jury in understanding some of the language used in text messages found on Ethan's phone. Officer Hurst testified that he had taken "gang training and classes," but that most of what he knew about "how the streets use" certain slang terms he learned from "[p]ersonal experience." He said that he had learned "certain jargon" while investigating narcotics and gang cases, and that he was also familiar with slang

24

"terms and terminology" because he was personally "in the streets young" and "had used [those terms] when [he] was a young'un." He further indicated that movies had "a lot of" impact on the "basic talk" used "in the criminal world."

According to Officer Hurst's testimony, the word "slide" refers to having "shot at somebody"; the word "federal" can refer to law enforcement surveillance; the word "bless" is a "street term" used by "gang members" that refers to "t[aking] care of [an] individual," that is, harming a person by, for example, causing their "death," "beat[ing] them up," or "robb[ing] them"; the abbreviation "OPP" refers to an "opponent"; and the phrase "I'm tweaking," as used "[i]n a gang context" or by someone "in a criminal lifestyle," means "I'm scared."

With the benefit of Officer Hurst's testimony, the jury could infer from the text messages that Bennett and Ethan agreed that they should "bless" (harm or kill) Randolph; that Bennett considered Randolph his "opp" (opponent); that Bennett claimed to have "slid[ ]" (shot) at Randolph's mother's house (where Randoph spent much of his time) and planned to go back to shoot at Randolph again; that what Bennett was saying over text messages made Ethan concerned about "[f]ederal[ ]" (law enforcement surveillance); and that Ethan was "tweakin" (scared) when he found out that Bennett had been pulled over by police after the shooting.

In its order denying Bennett's motion for new trial, the trial court concluded that trial counsel was not deficient for failing to raise an objection based on character evidence or prejudice because such objections would have been meritless. Trial counsel had testified at the motion-for-new-trial hearing that he did not think Officer Hurst's references to gang members using certain terms were harmful because, among other things, Officer Hurst "didn't call any of the co-defendants a gangster," and the fact that

gang members use a term "doesn't mean that every young person that uses that term is a gang member." In concluding that a character-evidence objection would have been overruled, the trial court found, consistent with trial counsel's testimony, that Officer Hurst's testimony did not indicate that only gang members used such slang terms or connect Bennett to a gang. And the court further found that Officer Hurst's testimony about the meaning of unfamiliar slang terms was highly probative in helping the jury understand the text messages, and that the testimony's probative value was not substantially outweighed by the risk of unfair prejudice.

Here, Bennett has not shown that the trial court erred in concluding that a character-evidence objection to Officer Hurst's testimony would have been overruled. First, the record supports the trial court's finding that Officer Hurst did not suggest that Bennett was a gang member. A review of Officer Hurst's trial testimony reveals that he did not testify that either of the Bennett brothers were gang members or that their use of slang terms used by gang members, criminals, and young people alike indicated that they were gang members. To the contrary, Officer Hurst's testimony clearly indicated that one need not be a gang member or criminal to use such terms, as he testified that he had personally used such language in his youth and that such language often derived from movies. Further, trial counsel, who had an opportunity to witness Officer Hurst testify, came away with the same impression—that Officer Hurst was not testifying or insinuating that the Bennett brothers' use of slang terms sometimes used by gang members meant that they were gang members. Accordingly, Bennett has not shown that the trial court clearly erred in finding that Officer Hurst's testimony did not indicate that he was a gang member. And as a result, the trial court did not err in concluding

that an objection under Rule 404(a)—that Officer Hurst's testimony was being admitted to prove that Bennett acted in conformity with some trait of character associated with gang membership—would have been overruled. See *Robinson v. State*, 322 Ga. 279, 283–84 (2025) (affirming the trial court's determination that trial counsel was not deficient where the factual finding underlying that determination "was supported by the record" and therefore "not clearly erroneous").

Bennett has likewise failed to show that the trial court erred in concluding that an objection to Officer Hurst's testimony under Rule 403 would have been overruled. "[A]ny risk of unfair prejudice was low" because, as the trial court reasonably found, Officer Hurst did not testify, or otherwise suggest, that the Bennett brothers' use of slang terms sometimes employed by gang members showed that they were themselves gang members. *Pierce*, 319 Ga. at 858. And the trial court reasonably determined that Officer Hurst's testimony was highly probative. As explained above, Officer Hurst's explanations of unfamiliar slang terms helped the jury understand that, in their text-message exchange, the Bennett brothers were planning to shoot and kill Randolph. See *Blash v. State*, 318 Ga. 325, 336 (2024) (holding that the trial court did not abuse its discretion in admitting testimony explaining "gang language" because the testimony "was highly probative," in that "it helped the jury understand the unfamiliar terminology in the calls," and the defendant's "statements using that vernacular showed that he wanted to speak with others because they were cooperating with the State in a manner that was unfavorable to him"); *Richardson v. State*, 308 Ga. 70, 71–72 (2020) (holding that the trial court did not abuse its discretion in admitting testimony from a gang expert that a letter sent by the defendant "contained numerous gang references" because the letter

27

was "incomprehensible to someone unfamiliar with the vernacular of [the defendant's] gang," and the testimony showed that the defendant's letter was an "attempt to conceal his involvement in the crimes," which "was evidence of his guilt"). The text-message exchange was a key piece of evidence that the State relied on in closing arguments to show that Bennett intended to kill Randolph. And because, as the trial court reasonably determined, Bennett "has not shown that the low risk of unfair prejudice" from Officer Hurst's testimony "substantially outweighed the probative value of the evidence," he has not established that his trial counsel performed deficiently in failing to raise an objection to the evidence under Rule 403. *Pierce*, 319 Ga. at 858.

(d) Bennett contends that his trial counsel was constitutionally ineffective for failing to stipulate that (as relevant to the charge against him for being a felon in possession of a firearm) he had prior felony convictions. As a result of the failure to stipulate, the State admitted into evidence a certified copy of Bennett's conviction for two counts of obstruction of an officer "by offering and doing violence to [a juvenile correctional] officer," which showed that he did not serve prison time for the offenses and was instead sentenced to five years' probation. On appeal, Bennett argues that this evidence was particularly harmful because he was on trial for violent crimes and his record of conviction showed that his prior felonies were for violent crimes, as well.

Assuming without deciding that trial counsel's decision not to stipulate to Bennett's prior convictions was deficient performance, Bennett has not shown prejudice. As we have explained, "[a] defendant may be prejudiced by the admission of a prior conviction into evidence when the prior conviction is of the nature likely to inflame the jury's passions and raise the risk of a conviction based on improper considerations." *Jackson v. State*, 317 Ga.

28

95, 103 (2023) (quotation marks omitted). But "this Court has [also] held that even violent crimes, crimes involving firearms, and drug offenses were not likely to inflame the jury's passions in murder cases." Id. at 103–04 (quotation marks omitted).

Here, Bennett has not shown that informing the jury that he had been convicted of obstructing an officer "likely inflamed the passions of the jury," much less that it caused him prejudice. *Jackson*, 317 Ga. at 104. As an initial matter, the only evidence admitted regarding Bennett's prior convictions was the record of conviction itself. Although the record of conviction showed that Bennett had been convicted of violent offenses (two counts of violently obstructing a juvenile correctional officer), it also reflected that the crimes for which Bennett had been convicted were dissimilar to the shooting-related crimes charged in the instant case (murder, aggravated assault with a deadly weapon, possession of a firearm during the commission of a felony, and being a felon in possession of a firearm), which reduced the risk that the jury might convict him based on his propensity to commit similar crimes. And the prosecutor did not even reference the crimes for which Bennett had previously been convicted during closing arguments, stating in conclusory fashion only that "[a] person possessing a firearm [charge] … is when a … person possesses a firearm having been convicted of a felony," and "[w]e have that in this case with both [d]efendants."

Given that Bennett's prior convictions were "[un]likely to inflame the jury's passions," that the prosecutor "did not present any details concerning" the prior convictions or "emphasize" them in any way, and that, as explained above, the evidence of Bennett's guilt "was strong," we conclude that Bennett has failed to show that "there is a reasonable probability that the result of his trial would have been different" but for his trial counsel's failure

29

to stipulate to his felon status. *Jackson*, 317 Ga. at 103–04 (quotation marks omitted) (holding that the defendant failed to show prejudice from trial counsel's failure to stipulate to the defendant's felon status, even where the State introduced evidence that the defendant had a prior conviction for "aggravated assault" and a charge for "possession of a firearm during the commission of a felony and possession of a firearm by a convicted felon, predicated on a felony conviction for possession of cocaine"). See also *Marrow v. State*, 322 Ga. 370, 374 (2025) (holding that the defendant did not establish prejudice from trial counsel's failure to stipulate to his prior felony conviction for armed robbery, where, among other things, "[t]he prior conviction was not emphasized in any way, or even mentioned again after the certified conviction was read into the record," and "the evidence against [the defendant] was strong").

5. Bennett argues that cumulative prejudice from the asserted trial court error and the enumerated instances of ineffective assistance of counsel warrant a new trial. We disagree.

For purposes of this analysis, we have assumed two instances of deficient performance on the part of trial counsel—the failure to object to testimony recounting a statement by Bennett's mother that her sons shot or killed Randolph, and the failure to stipulate to Bennett's felon status. As we explained above, Bennett failed to show prejudice from the former instance of assumed deficiency because, setting aside the challenged testimony, there was strong evidence of Bennett's guilt—including evidence from more than one source that Bennett had a motive to harm Randolph, text messages in which Bennett and his brother planned to shoot and kill Randolph, and statements Bennett made to his girlfriend after the crime that strongly suggested his culpability in the shooting. And we likewise concluded that Bennett had not

shown prejudice from the latter instance of assumed deficiency based in large measure on the same strong evidence of his guilt. "[C]onsidering collectively" the prejudice arising from these instances of assumed deficiency, we reach the same conclusion: Bennett "has not shown a reasonable probability of a different result" because, even if the evidence admitted as a result of the assumed deficiencies had been excluded, the evidence of Bennett's guilt would still have been strong. *Williams v. State*, 318 Ga. 83, 97 (2024).

6. Finally, Kates asks that we remand the case with instructions for the trial court to correct "scrivener's errors" on his sentencing sheet. As explained below, we decline to do so.

In its order denying Kates's motion for new trial, the trial court concluded that Kates's sentencing sheet contained "scrivener's errors," in that the counts listed on the sentencing sheet did not correspond to the appropriate count numbers in the indictment. The trial court ordered that the sentencing sheet be corrected, but it does not appear from the record on appeal that the trial court ever issued a revised sentencing sheet.

Although Kates and the State appear to agree on appeal that the trial court should issue a revised sentencing sheet for Kates, we disagree. As explained in footnote 1 above, the count numbers on Kates's sentencing sheet correspond to the count numbers in the indictment returned by the grand jury, rather than to the count numbers in the "dummy" indictment prepared for, and provided to, the jury at trial (which renumbered some of the counts). In concluding that the counts were misnumbered on Kates's sentencing sheet, it appears that the trial court either failed to appreciate that the count numbers on the indictment and "dummy" indictment were different, or erred in treating the "dummy" indictment as the indictment under which Kates was

31

convicted and thus as the indictment to which the sentencing sheet should correspond. Cf. *Sevostiyanova v. State*, 313 Ga. App. 729, 740 (2012) (explaining that a court order nol prossing a "dummy" accusation that was "sent out with the jury" and subsequently filed in error "had no effect on [the] appellant's convictions" under the operative accusation). Because the operative indictment was the one returned by the grand jury, and because the count numbers on Kates's sentencing sheet correspond to that indictment, there is no need for the trial court to revise the count numbers on his sentencing sheet. Accordingly, the trial court did not err in failing to "correct" the sentencing sheet, and we deny Kates's request that we remand the case for the trial court to do so.[4]

*Judgments affirmed. All the Justices concur, except Warren, P. J., not participating.*

---

[4] To the extent that any other sentencing errors in these cases remain, nothing in this opinion precludes the trial court from correcting those errors in accordance with OCGA § 17-10-1(f)(1) ("[W]ithin 120 days after receipt by the sentencing court of the remittitur upon affirmance of the judgment after direct appeal, … the court imposing the sentence has the jurisdiction, power, and authority to correct or reduce the sentence ….").